**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10069
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

KILEY KRZYZEK and CHRISTIAN CALCINES, individually and on behalf of all persons similarly situated,

Plaintiffs,

v.

OPENX TECHNOLOGIES, INC.,

Defendant.

Case No. 3:25-cv-05588-SI

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Date: January 16, 2026
Time: 10:00 a.m.
Courtroom: 1 - 17th Floor
Judge: Hon. Susan Illston

# TABLE OF CONTENTS

**PAGE(S)**


INTRODUCTION .......... 1

ARGUMENT .......... 2

I. PLAINITFFS SUFFERED CONCRETE AND PARTICULARIZED INJURIES AS REQUIRED BY ARTICLE III .......... 2

A. Defendant's Creation And Sale Of Profiles Constitutes A Concrete Injury Sufficient For Article III Standing .......... 2

B. Defendant Mischaracterizes The Ninth Circuit's Decision in *Popa* .......... 3

C. Defendant Connects Users To Non-Anonymous Profiles Using The Information It Records .......... 5

II. PLAINTIFFS STATE A CLAIM FOR INTRUSION UPON SECLUSION .......... 6

III. PLAINTIFFS STATE CLAIMS FOR VIOLATION OF CIPA SECTION 631 AND THE ECPA .......... 8

A. Plaintiffs Allege The Interception Of Content .......... 8

B. Defendant Intercepted The Contents Of Plaintiffs' Communications While The Communications Were In Transit .......... 9

C. Defendant Is A Third Party Eavesdropper .......... 11

D. The Crime-Tort Exception To The ECPA Applies .......... 13

IV. PLAINTIFFS STATE A CLAIM FOR VIOLATION OF CIPA § 638.51 .......... 14

A. Defendant's Tracker Records "Routing, Addressing, Or Signaling Information" Transmitted By Plaintiffs' Computers .......... 15

B. The CIPA Covers Internet Trackers Per The Plain Text, Weight Of Authority, And Legislative History .......... 17

C. The CIPA And CCPA Do Not Conflict, And The CIPA Applies Regardless Under The CCPA's Plain Text .......... 20

V. PLAINTIFFS STATE A CLAIM FOR UNJUST ENRICHMENT .......... 20

VI. TO THE EXTENT THE COURT GRANTS THE MOTION (AND IT SHOULD NOT), PLAINTIFFS SHOULD BE PERMITTED LEAVE TO AMEND .......... 21

CONCLUSION .......... 22

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Ambriz v. Google, LLC*,
2025 WL 830450 (N.D. Cal. Feb. 10, 2025) .......... 11

*Aviles v. Liveramp, Inc.*,
2025 WL 487196 (Los Angeles Super. Ct. Jan. 28, 2025) .......... 16

*Bradshaw v. Lowe's Companies, Inc.*,
2025 WL 3171740 (S.D. Cal. Nov. 12, 2025) .......... 15, 18

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) .......... 13

*Brown v. Google LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023) .......... 7, 9

*Cabot v. Lectric eBikes LLC*,
2025 WL 2256328 (N.D. Cal. Aug. 7, 2025) .......... 21

*Camplisson v. Adidas Am., Inc.*,
2025 WL 3228949 (S.D. Cal. Nov. 18, 2025) .......... 4, 16

*Collyer v. Catalina Snacks Inc.*,
712 F. Supp. 3d 1276 (N.D. Cal. 2024) .......... 21

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .......... 17

*Deivaprakash v. Condé Nast Digital*,
2025 WL 2779193 (N.D. Cal. Sept. 30, 2025) .......... 2, 5

*Deivaprakash v. Condé Nast Digital*,
--- F. Supp. 3d ---, 2025 WL 2541952 (N.D. Cal. Sept. 4, 2025) .......... 7, 15

*Dellasala v. Samba TV, Inc.*,
2025 WL 3034069 (N.D. Cal. Oct. 30, 2025) .......... 4

*Doe v. Talkiatry Management Servs., LLC*,
2025 WL 3190813 (C.D. Cal. Oct. 1, 2025) .......... 16

*Doe v. Tenet Healthcare Corp.*,
789 F. Supp. 3d 814 (E.D. Cal. 2025) .......... 14

*Drummer v. Costar Grp., Inc.*,
2025 WL 3190656 (C.D. Cal. Oct. 22, 2025) .......... 17, 18, 19

*Echeverria-Corzan v. Fox Corp.*,
2025 WL 3128194 (N.D. Cal. Nov. 7, 2025) .......... 1, 15

*Flanagan v. Flanagan*,
27 Cal. 4th 766 (2002) .......... 19

*Frasco v. Flo Health, Inc.*,
349 F.R.D. 557 (N.D. Cal. 2025) .......... 3

*Fregosa v. Mashable, Inc.*,
2025 WL 2886399 (N.D. Cal. Oct. 9, 2025) .......... 15, 17, 19

*Gabrielli v. Motorola Mobility LLC*,
2025 WL 1939957 (N.D. Cal. July 14, 2025) .......... 2, 7, 17, 18

*Garon v. Keleops USA, Inc.*,
2025 WL 2522374 (N.D. Cal. Sept. 2, 2025) .......... 16, 18, 19

*Gladstone v. Amazon Web Servs., Inc.*,
739 F. Supp. 3d 846 (W.D. Wash. 2024) .......... 11

*Graham v. Noom, Inc.*,
533 F. Supp. 3d (N.D. Cal. 2021) .......... 11, 12

*Harris v. McDonald's Corp.*,
2021 WL 2172833 (N.D. Cal. Mar. 24, 2021) .......... 21

*In re Accellion, Inc. Data Breach Litig.*,
2025 WL 2799102 (N.D. Cal. Sept. 30, 2025) .......... 3

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 5, 7, 12

*In re Meta Pixel Tax Filing Cases*,
793 F. Supp. 3d 1147 (N.D. Cal. 2025) .......... 17

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) .......... 5, 9, 10

*Javier v. Assurance IQ, LLC*,
649 F. Supp. 3d 891 (N.D. Cal. 2023) .......... 11

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) .......... 1, 2, 8, 9

*Khamooshi v. Politico LLC*,
2025 WL 2822879 (N.D. Cal. Oct. 2, 2025) .......... 5

*Lesh v. Cable News Network, Inc.*,
767 F. Supp. 3d 33 (S.D.N.Y. 2025) .......... 18

*Lightoller v. JetBlue Airways Corp.*,
2023 WL 3963823 (S.D. Cal. June 12, 2023) ..... 5

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) ..... 22

*Low v. LinkedIn Corp.*,
900 F. Supp. 2d 1010 (N.D. Cal. 2012) ..... 5

*Marden v. LMND Med. Grp., Inc.*,
2024 WL 4448684 (N.D. Cal. July 3, 2024) ..... 13

*Matera v. Google Inc.*,
2016 WL 8200619 (N.D. Cal. Aug. 12, 2016) ..... 19

*McClung v. AddShopper, Inc.*,
2024 WL 189006 (N.D. Cal. Jan. 17, 2024) ..... 3

*Mekhail v. N. Mem'l Health Care*,
726 F. Supp. 3d 916 (D. Minn. 2024) ..... 14

*Mikulsky v. Noom, Inc.*,
2024 WL 251171 (S.D. Cal. Jan. 22, 2024) ..... 5

*Mirmalek v. Los Angeles Times Communications LLC*,
2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) ..... 18, 20

*Moody v. C2 Educational Systems Inc.*,
742 F. Supp. 3d 1072 (C.D. Cal. 2024) ..... 18

*Murphy v. Olly Pub. Benefit Corp.*,
651 F. Supp. 3d 1111 (N.D. Cal. Jan. 17, 2023) ..... 21

*NovelPoster v. Javitch Canfield Grp.*,
140 F. Supp. 3d 938 (N.D. Cal. 2014) ..... 10

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ..... 3, 4

*Prang v. Los Angeles County Assessment Appeals Board*,
15 Cal.5th 1152 (2024) ..... 17

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. 2024) ..... 9, 14

*R.S. v. Prime Healthcare Servs., Inc.*,
2025 WL 103488 (C.D. Cal. Jan. 13, 2025) ..... 14

*Revitch v. New Moosejaw, LLC*,
2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) ..... 10

*Ribas v. Clark*,
38 Cal. 3d 355 (1985) ........ 12

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025) ........ passim

*Rodriguez v. Autotrader.com, Inc.*,
762 F. Supp. 3d 921 (C.D. Cal. 2025) ........ 17

*Roney v. Miller*,
705 F. App'x 670 (9th Cir. 2017) ........ 21

*Rose v. Variety Media, LLC*,
2025 WL 2794920 (Super. Ct. Los Angeles Cnty. Sept. 24, 2025) ........ 15, 16, 20

*Saeedy v. Microsoft Corp.*,
2023 WL 8828852 (W.D. Wash. Dec. 21, 2023) ........ 5

*Scarlett v. Future US, LLC*,
2025 WL 2614587 (Super. Ct. San Francisco Cnty. Sept. 5, 2025) ........ 15

*Selby, v. Sovrn Holdings, Inc.*,
2025 WL 2950164 (N.D. Cal. Oct. 17, 2025) ........ passim

*Shah v. Cap. One Fin. Corp.*,
768 F. Supp. 3d 1033 (N.D. Cal. 2025) ........ 13

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) ........ 15, 16, 18, 19

*Smith v. LoanMe*,
11 Cal. 5th 183 (2021) ........ 19

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ........ 20, 21

*Stein v. Edward-Elmhurst Health*,
2025 WL 580556 (N.D. Ill. Feb. 21, 2025) ........ 14

*Taylor v. ConverseNow Techs., Inc.*,
2025 WL 2308483 (N.D. Cal. Aug. 11, 2025) ........ 11, 12

*TBG Ins. Serv. Corp. v. Super. Ct.*,
96 Cal. App. 4th 443 (2002) ........ 18

*Turner v. Nuance Commc'ns, Inc.*,
735 F. Supp. 3d 1169 (N.D. Cal. 2024) ........ 11

*U.S. Dept. of Justice v. Reporters Committee for Freedom of Press*,
489 U.S. 749 (1989) ........ 3

*United States v. Corinthian Colleges*,
655 F.3d 984 (9th Cir. 2011) .......... 22

*United States v. United Healthcare Ins. Co.*,
848 F.3d 1161 (9th Cir. 2016) .......... 21

*Walsh v. Dollar Tree Stores, Inc.*,
2025 WL 2939229 (N.D. Cal. Oct. 16, 2025) .......... 18

*Wright v. Truecare Prop. Holdings, LLC*,
2025 WL 3248749 (S.D. Cal. Nov. 21, 2025) .......... 16

*Xu v. Reuters News & Media, Inc.*,
2025 WL 3035016 (Super. Ct. Santa Clara Cnty. Oct. 24, 2025) .......... 7, 15, 20

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) .......... 11

**STATUTES**

18 U.S.C. § 2511(d) .......... 13

Cal. Civ. Code. § 1798.175 .......... 20

Cal. Civ. Code § 1798.100(a) .......... 20

Cal. Pen. Code § 631(a) .......... 18

Cal. Pen. Code § 638.50 .......... 17, 18, 19

Cal. Pen. Code § 638.50(b) .......... 15, 18

Cal. Pen. Code § 638.52 .......... 18

Plaintiffs Kylie Krzyzek and Christian Calcines ("Plaintiffs") respectfully submit this opposition to Defendant OpenX Technologies, Inc.'s ("Defendant") Motion to Dismiss the First Amended Complaint (ECF No. 26) (the "Motion" or "MTD").

**INTRODUCTION**

This case involves egregious privacy violations perpetuated on an enormous scale across the internet by Defendant. Plaintiffs' First Amended Complaint (ECF No. 23) (the "FAC") alleges that by contracting with hundreds of website operators, data brokers, and technology companies, Defendant (a registered data broker itself) improperly collects massive amounts of data on millions of internet users, including their identifying information, addressing information, and the contents of their private communications with websites, all without website users' knowledge or consent. FAC ¶¶ 1, 47-64, 67-69, 92-93, 144, 165-224. Defendant does this to profit off consumers' data, compiling the information it collects into detailed profiles on consumers and their online behavior, which are sold to dozens of entities to facilitate real-time bidding. *Id.* ¶¶ 2, 43-46, 51, 56, 85-91, 140, 160, 172-174, 185, 188, 198. The result is dragnet surveillance of near every aspect of Plaintiffs' and Class Members' lives and a loss of control of even one's most intimate information, which is made available for sale to numerous other data brokers and advertisers in the blink of an eye without notice or consent. *Id.* ¶¶ 44, 92, 163-164, 186-187.

Numerous courts have sustained claims like Plaintiffs' that allege data brokers like Defendant conducted such widespread surveillance, profiling, and data selling. *See*, *e.g.*, *Selby, v. Sovrn Holdings, Inc.*, 2025 WL 2950164 (N.D. Cal. Oct. 17, 2025); *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075 (N.D. Cal. 2025); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 929 (N.D. Cal. 2023); *Lewis v. Magnite, Inc.*, Case No. 2:25-cv-3448, ECF No. 55 (C.D. Cal. Dec. 4, 2025).[1] Courts in this District have even ruled that, at the pleadings stage, Defendant's Tracker[2] is an illegally installed "pen register" within the meaning of the CIPA. *See Echeverria-Corzan v. Fox Corp.*, 2025 WL 3128194, at *1 (N.D. Cal. Nov. 7, 2025). This Court should not reach a different

[1] Attached hereto as **Exhibit 1**.

[2] All terms not defined herein shall have the same meaning as in the FAC.

result, despite Defendant's attempts to minimize the scope of the harms alleged and to raise factual disputes. For the reasons set forth below, Defendant's Motion should be denied.

## ARGUMENT

### I. PLAINITFFS SUFFERED CONCRETE AND PARTICULARIZED INJURIES AS REQUIRED BY ARTICLE III

#### A. Defendant's Creation And Sale Of Profiles Constitutes A Concrete Injury Sufficient For Article III Standing

Ignoring the crux of Plaintiffs' allegations, Defendant argues that Plaintiffs lack Article III standing because "Plaintiffs do not allege any specific personal information was collected by OpenX that would be 'highly offensive' or that 'implicates a protectable privacy interest.'" MTD at 10. This is wrong.

Defendant grossly mischaracterizes the allegations in the FAC. Plaintiffs allege that Defendant is a data broker that "compiled detailed profiles by tracking [Plaintiffs'] interactions across many websites, including websites where they disclosed sensitive data" and selling that information to any and all interested advertisers. *Selby*, 2025 WL 2950164, at *3 n.3; *see also*, *e.g.*, FAC ¶¶ 43-44, 48-64, 92-93, 163, 186, 198. Further, Defendant's cherry-picked quotation about the potential of the Partner Trackers to identify Plaintiffs ignores the extensive allegations that *Defendant itself* identifies Plaintiffs and Class Members based on the information Defendant collects. *See, e.g.*, FAC ¶¶ 42-43, 58, 74, 92, 187.

This more than suffices for Article III standing. *Deivaprakash v. Condé Nast Digital*, 2025 WL 2779193, at *2 (N.D. Cal. Sept. 30, 2025) (finding allegations satisfy "the requirements of *Popa*" where the plaintiff alleged "internet trackers allowed third parties to generate profiles reflecting his personal information"); *Riganian*, 2025 WL 2021802, at *6 ("[T]he tracking of individuals' activity across thousands of websites, combined with extensive offline records gathered over decades, to generate uniquely identifying profiles on those individuals is sufficient to allege intrusion into privacy."); *Gabrielli v. Motorola Mobility LLC*, 2025 WL 1939957, at *6 (N.D. Cal. July 14, 2025) ("Gabrielli's allegations that Motorola deprived him control of personal information regarding his digital activity and profile are sufficient to establish a concrete injury to his right to privacy and confer standing."); *Katz-Lacabe*, 668 F. Supp. 3d at 940 (finding Article III standing based on

"Oracle's ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers") (cleaned up); *McClung v. AddShopper, Inc.*, 2024 WL 189006, at *1 (N.D. Cal. Jan. 17, 2024) ("Misappropriating a person's browsing activity across a network of thousands of online retailers and using it to barrage that person's devices with unwanted email communications … is the type of intrusion on privacy and seclusion that can be vindicated in the federal courts."); *Lewis*, Ex. 1 at 13 ("Defendant has effectively deanonymized Plaintiffs and created digital fingerprints for them, all without their consent. Those allegations are enough to plausibly plead a reasonable expectation of privacy.") (cleaned up).

As a result of Defendant's conduct, Plaintiffs and others lost their right to "control [] information concerning his or her person," which is encompassed within "both the common law and the literal understandings of privacy." *U.S. Dept. of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 763 (1989). This is at least analogous to the tort of intrusion upon seclusion (alleged in the FAC), although an exact match is not required by Ninth Circuit jurisprudence. *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 580 (N.D. Cal. 2025) ("[T]he harm made actionable at common law was an individual's loss of control over her private affairs or concerns by an interloper's tortious intentional interference.") (cleaned up); *In re Accellion, Inc. Data Breach Litig.*, 2025 WL 2799102, at *13 (N.D. Cal. Sept. 30, 2025) ("[T]he Court concludes the better reading of *TransUnion* is that harms need only be similar in kind to those redressed by common law torts. That is because *TransUnion* expressly rejected the notion that an 'exact duplicate' is required….").[3]

### B. Defendant Mischaracterizes The Ninth Circuit's Decision in *Popa*

Defendant relies primarily on *Popa v. Microsoft Corp.* 153 F.4th 784 (9th Cir. 2025) for its standing argument and incorrectly contends that *Popa* involved "more extensive data allegedly collected." MTD at 9. Defendant argues that "Plaintiffs here allege only that OpenX collected

[3] As to Plaintiff Krzyzek specifically, Defendant contends "Covered California does not use the OpenX pixel." MTD at 6. Plaintiffs' allegations make clear the OpenX Tracker was loaded onto the Covered California Website and recorded information from users thereon, and matched users to profiles held by OpenX. FAC ¶¶ 177-184. The traffic this analysis is based on is publicly available, but to the extent Defendant disagrees with these findings, that is a question of fact.

information about their devices, browsers, and unspecified 'web browsing activity' —a small subset of the type of nonprivate information allegedly collected in *Popa*." MTD at 10. This is incorrect.

As an initial matter, *Popa* did not disturb pre-existing Article III standing jurisprudence. *See Dellasala v. Samba TV, Inc.*, 2025 WL 3034069, at *2 (N.D. Cal. Oct. 30, 2025) ("*Popa* did not set forth a new rule of law…"); *Camplisson v. Adidas Am., Inc.*, 2025 WL 3228949, at *6 (S.D. Cal. Nov. 18, 2025) ("Defendant's reliance on *Popa* is misplaced. Rather than introducing new case law that adds heightened requirements for privacy harms, *Popa* uses the same common law rules discussed above and evaluates the specific facts of that case.").

And, contrary to Defendant's argument, "[t]he scope of the alleged tracking in this case is materially more invasive than the limited tracking at issue" in *Popa*. *Selby*, 2025 WL 2950164, at *3 n.3. As one court recently noted:

> *Popa* involved a claim against the defendant's use of session-replay technology, which collected information on what products the plaintiff browsed and where her mouse hovered while on the website. Given that the information concerned how the plaintiff interacted with the site rather than her personal, private information, the *Popa* court found that the nature of the collected information was not embarrassing, invasive, or otherwise private and did not fall within the traditional privacy harms at common law. This is distinguishable from the facts presented in this case, where the collection of Plaintiffs' information concerns their person, is much broader in scope, and has been found to be a privacy harm in a wide variety of cases.

*Camplisson*, 2025 WL 3228949, at *6 (cleaned up); *see also Selby*, 2025 WL 2950164, at *3 n.3. ("*Popa* involved "the tracking of plaintiff's non-sensitive interactions with a single website.").

And all the information in *Popa* was anonymous because the website had configured the third party software to exclude the user's "street number and zip code." *Popa*, 153 F.4th at 787, 787 n.1. In addition, the only thing the third party did with the information in *Popa* was tell websites "which elements of a website have high user engagement, how far website users scrolled on the website, and the total clicks within a given area on the website." *Id.* at 786 (cleaned up). So, *Popa* boiled down to a third party collecting anonymous information that was used in a manner akin to "a store clerk's observing shoppers in order to identify aisles that are particularly popular or to spot problems that disrupt potential sales." *Id.* at 791. Unlike here, there was no linkage of information to non-

anonymous profiles maintained by data brokers, no sale of that information to advertisers, and no loss of control of personal information because personal information was not captured in *Popa*.

Further, "*Popa* confirmed that *Facebook* remains good law," and thus, allegations showing the "compilation of personally identifiable browsing history demonstrate[] individual circumstances giving rise to … injuries that satisfy[y] Article III's standing requirements." *Deivaprakash*, 2025 WL 2779193, at *1 (citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) (otherwise cleaned up).

Defendant's remaining authorities concerned substantially more limited tracking on a single website, or anonymous tracking, unlike here. *Khamooshi v. Politico LLC*, 2025 WL 2822879, at *2 (N.D. Cal. Oct. 2, 2025) (alleging collection of information like "geolocation data, device type, browser type, and 'device fingerprints,'" but again without linkage to comprehensive profiles that were sold to advertisers); *Mikulsky v. Noom, Inc.*, 2024 WL 251171, at *5 (S.D. Cal. Jan. 22, 2024) ("[T]he FAC does not allege that Plaintiff provided any personally identifiable information that would allow Noom to link the 'sensitive health information' she purportedly provided via the Noom Survey to Plaintiff."); *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1021 (N.D. Cal. 2012) ("*Lowe II*") (finding the *Lowe I* plaintiffs' amended complaint "articulated harm which is 'concrete' for the purposes of Article III standing."); *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 951 (N.D. Cal. 2023) (distinguishing *Lightoller v. JetBlue Airways Corp.*, 2023 WL 3963823 (S.D. Cal. June 12, 2023), as involving anonymous information); *Saeedy v. Microsoft Corp.*, 2023 WL 8828852, at *5 (W.D. Wash. Dec. 21, 2023) (distinguishing allegations from those like here involving the "unauthorized correlation of the collected data with the user's personal profiles that it then sold to advertisers to generate revenue").

### C. Defendant Connects Users To Non-Anonymous Profiles Using The Information It Records

Defendant also argues that the information it recorded here is anonymous. MTD at 2 ("OpenX collects only non-identifying information tied to devices—not individuals."). Of course, this is a question of fact not appropriate for resolution at this juncture. Regardless, Plaintiffs allege the information collected here is far from anonymous. Plaintiffs allege that Defendant uses the

identifiers it records to tie Plaintiffs and Class Members back to profiles within an "identity graph" containing their e-mails and phone numbers, which are used "for data and identity." FAC ¶¶ 56-57.[4] Notably, Defendant refers to this identity graph as encompassing "unique people," not devices. *Id.* ¶ 58. Defendant further compiles these profiles into segments that target specific consumers based on collected attributes. *Id.* ¶¶ 60-61. And Defendant supplements its profiles by syncing with Partner Trackers. *Id.* ¶ 183. Through this process, Defendant has amassed access to "nearly three-quarters of all Americans' identities." *Id.* ¶ 62.

Thus, the information Defendant records here is anything but anonymous. *See Selby*, 2025 WL 2950164, at *3 ("Plaintiffs have alleged that Sovrn … compile[s] detailed profiles of each Plaintiff's online web browsing activity … tied to their email address and other personal identifiers."); *Riganian*, 791 F. Supp. 3d at 1087 ("[T]he Court does not find LiveRamp's pseudonymization argument persuasive, as Plaintiffs allege that the Attribute Enrichment feature allows any of LiveRamp's customers to seek any segment information associated with an individual by providing the individual's name, physical address, or email address—effectively rendering any anonymity functionally meaningless.") (cleaned up).

## II. PLAINTIFFS STATE A CLAIM FOR INTRUSION UPON SECLUSION

Defendant argues "Plaintiffs do not allege the reasonable expectation of privacy or egregious conduct required for Intrusion Upon Seclusion." MTD at 11. This is wrong.

*Selby*, *Riganian*, and *Lewis* are instructive. Like here, all three cases involved a third party "engage[d] in unauthorized widespread tracking and data collection, allowing it to compile detailed profiles of each Plaintiff's online web browsing activity—including highly sensitive browsing activity—tied to their email address and other personal identifiers." *Selby*, 2025 WL 2950164, at *3 (cleaned up). Both courts held such conduct constitutes "a 'highly offensive' privacy intrusion" that suffices for "the tort of intrusion upon seclusion." *Id.*; *Riganian*, 2025 WL 2021802, at *7 ("[T]he Court cannot at this stage conclude as a matter of law that the alleged aggregation, synthesis, and sale of comprehensive online and offline data of individuals without their knowledge is not highly

[4] Although the e-mails and phone numbers are hashed, Plaintiffs allege—and the FTC agrees—that "hashing is an insufficient method of anonymizing information." FAC ¶¶ 147-151.

offensive."); *Lewis*, Ex. 1 at 13 ("Defendant has effectively deanonymized Plaintiffs and created digital fingerprints for them, all without their consent. Those allegations are enough to plausibly plead a reasonable expectation of privacy.") (cleaned up).

Likewise, in *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 603, the Ninth Circuit held that users "have adequately alleged a reasonable expectation of privacy" where, like here, "Facebook acquire[d] an 'enormous amount of individualized data' through its use of cookies on the countless websites that incorporate Facebook plug-ins" that "can be easily collected without user knowledge." This is precisely what Plaintiffs allege here—that Defendant unlawfully tracks, collects, and deanonymizes Plaintiffs' web browsing activity and identification such that Defendant is able to create "comprehensive user profiles" by matching individuals' identities with the data collected about them. FAC ¶ 43; *see also id.* ¶¶ 53, 59, 88, 186-189, 190, 243; *id.* ¶ 174 (Defendant tracks "the future web activity" of individuals and adds it to profiles).

Against these directly on-point (and controlling) authorities, Defendant contends "there is no reasonable expectation of privacy in the type of information Plaintiffs allege that OpenX collected." MTD at 13. As an initial matter, "[g]iven the factually intensive nature of the inquiry, courts are generally hesitant to decide" whether a reasonable expectation of privacy exists. *Motorola Mobility*, 2025 WL 1939957, at *10. Regardless, Defendant's quip misrepresents Plaintiffs' allegations and defies Ninth Circuit precedent. *In re Facebook*, 956 F.3d at 603; *see also Brown v. Google LLC*, 685 F. Supp. 3d 909, 937 (N.D. Cal. 2023) ("Google's narrower argument, that California courts have developed a presumption that users do not have an expectation of privacy over internet communications, fails on examination."). "[I]t does not matter whether [Plaintiffs] had a reasonable expectation of privacy in the information collected because the privacy violation … it encompasses how th[e] collection allegedly allowed [Defendant] to: (1) build a profile reflecting [Plaintiffs'] personal information; and (2) interfere with [Plaintiffs'] ability to remain anonymous." *Deivaprakash v. Condé Nast Digital*, --- F. Supp. 3d ---, 2025 WL 2541952, at *4 (N.D. Cal. Sept. 4, 2025); *Xu v. Reuters News & Media, Inc.*, 2025 WL 3035016, at *3 (Super. Ct. Santa Clara Cnty. Oct. 24, 2025) ("whether Plaintiff has a reasonable expectation of privacy to the collected information does not preclude him from alleging an invasion of privacy injury" because "Plaintiff

alleges that the collected information was used to build a profile for users based on their information, interests, and interferences"); *Riganian*, 2025 WL 2021802, at *6 ("[T]he tracking of individuals' activity across thousands of websites, combined with extensive offline records gathered over decades, to generate uniquely identifying profiles on those individuals is sufficient to allege intrusion into privacy."); *Lewis*, Ex. 1 at 13.

Defendant next argues Plaintiffs' claim fail because "they have not alleged that OpenX's conduct—which is expressly permitted and regulated by state and federal laws—is highly offensive or egregious." MTD at 14. Notwithstanding this is again a question of fact, it is highly questionable whether Defendant's practices—involving the widespread data collection and profiling of users without consent—is permitted by "state and federal laws." That Defendant must "register" as a data broker under the CCPA does not mean it is not acting with authority. Indeed, Defendant previously settled with the FTC based on allegations it was violating "federal children's privacy law." FAC ¶ 63.

Regardless, "[b]y Defendant's logic, no claims like Plaintiffs' could go forward … in the wake of the CCPA and [other state and federal laws]. Of course, that is not the case, as plaintiffs have a reasonable expectation of privacy where data is collected without their consent." *Lewis*, Ex. 1 at 13 (cleaned up). As courts have found, Defendant's conduct related to comprehensive profiling and data selling is "highly offensive" and "go[es] well beyond the routine commercial behavior of collecting contact information for sending advertisements." *Selby*, 2025 WL 2950164, at *3; *Riganian*, 2025 WL 2021802, at *7 (cleaned up); *see also id.* ("[T]he Court cannot at this stage conclude … that the alleged aggregation, synthesis, and sale of comprehensive online and offline data of individuals without their knowledge is not highly offensive."); *Katz-Lacabe*, 668 F. Supp. 3d at 942 (finding allegations "of data collection would go well beyond the 'routine commercial behavior'").

## III. PLAINTIFFS STATE CLAIMS FOR A VIOLATION OF CIPA § 631 AND THE ECPA

### A. Plaintiffs Allege The Interception Of Content

Defendant argues that Plaintiffs' CIPA § 631(a) and ECPA claims fail because "Plaintiffs do not plausibly allege that OpenX intercepted the 'contents' of their" electronic communications.

MTD at 16. Specifically, Defendant contends that "information about … devices, browsers, visits to … [web pages] (though not any specific URLs), and … 'future browsing activity'" do not constitute "contents." *Id.* Defendant is wrong for multiple reasons.

"Content is defined to 'include[] any information concerning the substance, purport, or meaning of [the] communication.'" *Brown v. Google LLC*, 685 F. Supp. 3d 909, 935 (N.D. Cal. 2023). This includes "the links, pages, and tabs users click and view and the search terms they employ," including those contained in URLs. *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024) ("URLs which disclose search terms that reveal website users' 'personal interests, queries, and habits' are 'contents' of communications under CIPA and ECPA.").

Here, Plaintiffs alleges that, at least on some websites, Defendant collects the specific web pages they visit and read, which disclose "personal interests, queries, and habits." *Id.*; *see* FAC ¶¶ 156-174 ("[t]he OpenX Tracker also intercepts the detailed, full-string URL from each page of the Bon Appetit website a user visits").[5] The FAC also alleges that the Partner Trackers collect similarly detailed URLs, and that by syncing with these Partner Trackers, Defendant aides the Partner Trackers' interception of contents by de-anonymizing users. *See* FAC ¶¶ 163-85. In either case, Plaintiffs plausibly allege that either Defendant itself intercepted the "contents" of users' communications or aided the Partner Trackers in doing so. *Selby*, 2025 WL 2950164, at *3 (finding "contents" were intercepted where "Plaintiffs have alleged that, among other things, Sovrn collects 'full-string URLs' that reflect not only the website visited, but also, for example, search queries and specific items Plaintiffs viewed").

### B. Defendant Intercepted The Contents Of Plaintiffs' Communications While The Communications Were In Transit

Defendant argues that Plaintiffs do not allege an "in transit" interception because "[a]ccording to Plaintiffs … it is only once Plaintiffs reached the websites that OpenX allegedly collected their information." MTD at 18-19 (cleaned up). But the allegations Defendant quotes describe the process by which Defendant's "code gets to a website user's device" in the first instance.

[5] Plaintiffs allege that the websites listed in the FAC are just exemplars, and that "there are hundreds of thousands of other websites where [Defendant collects] the same or similar information." FAC ¶ 163.

*James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 962 (N.D. Cal. 2023). Defendant "ignores the [other] paragraphs … which indicate that, once the [OpenX Tracker] is on [a user's browser], it *then* begins to intercept communications when the user makes communications to the website." *Id.*; *see also, e.g.*, FAC ¶¶ 85. Indeed, Plaintiffs clearly allege that after the OpenX Tracker loads tracking software in the form of cookies onto a user's browser, the OpenX Tracker then "intercepts the detailed, full-string URL from each page of the Bon Appetit website a user visits, as detailed above, thereby intercepting the user's communications with the website regarding which articles they want to view." FAC ¶ 170; *id.* ¶¶ 169-74; *see also Selby*, 2025 WL 2950164, at *3 (finding in-transit interception); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications, so there is no reason to consider the first part of an electronic communication beyond the statute's reach.").

Moreover, Plaintiffs' allegations showing an in-transit interception occurred "are not conclusory." *Selby*, 2025 WL 2950164, at *3; *see*, *e.g.*, FAC ¶ 85 (once the OpenX Tracker is set up on a website, "OpenX collects information automatically as users access websites and mobile applications."); *id.* ¶ 168 ("Within seconds of the user reaching the Bon Appetit website, the OpenX Tracker takes over 75 actions, including intercepting communications…"); *id.* ¶¶ 159-60, 166-72, 191-93. Plaintiffs laboriously explain how the real-time bidding process works (FAC ¶¶ 10-32, 37-46), demonstrate how Defendant's Tracker operates on websites (FAC ¶¶ 85-88, 163-185), and detail how Defendant monetizes collected user data in real-time on hundreds of websites, including the two websites that the named Plaintiffs' claims arise out of (FAC ¶¶ 186-98).

Finally, Defendant relies on *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938 (N.D. Cal. 2014) to argue its Tracker is akin to "collecting information about emails after they are received." MTD at 19. This is not the case for the reasons discussed above. Moreover, the *NovelPoster* plaintiff alleged that the defendants logged onto the plaintiff's corporate email system and used the company e-mail account, thus accessing e-mails are they were received. *See*

*Novelposter*, 140 F. Supp. 3d at 953. In contrast, as described above, Plaintiffs detail Defendant's *simultaneous* interception of users' data on numerous websites through first loading the OpenX Tracker cookies onto each user's browser, then collecting user data and full-string URLs as users browse individual webpages within each web site *as* users communicate with the websites. *See* FAC ¶¶ 186-224.

**C. Defendant Is A Third Party Eavesdropper**

Defendant contends that it is "exempt from liability under both CIPA and ECPA" because Defendant and its publisher partners "are parties to Plaintiffs' alleged communications" and "OpenX is 'an extension' of the website operators." MTD at 17 (citing *Graham v. Noom, Inc.*, 533 F. Supp. 3d 832, 832 (N.D. Cal. 2021). As to the CIPA, this an outdated standard that has been rejected by a "growing number of district courts." *Turner v. Nuance Commc'ns, Inc.*, 735 F. Supp. 3d 1169, 1184 (N.D. Cal. 2024) (collecting cases). Instead, the prevailing view among this Court and others is that a software-as-a-service ("SaaS") provider like Defendant is a "third party" under CIPA § 631 if it "ha[s] the capability of using its recording for another purpose." *Taylor v. ConverseNow Techs., Inc.*, 2025 WL 2308483, at *4 (N.D. Cal. Aug. 11, 2025) (Illston, J.) (citing *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023)); *Gladstone v. Amazon Web Servs., Inc.*, 739 F. Supp. 3d 846, 854 (W.D. Wash. 2024); *Ambriz v. Google, LLC* 2025 WL 830450, at *3 (N.D. Cal. Feb. 10, 2025); *Yoon v. Lululemon USA, Inc.* 549 F. Supp. 3d 1073, 1081 (C.D. Cal. 2021).

Applying this prevailing standard here, Defendant's capabilities "go beyond the ordinary function of a tape recorder." *Taylor*, 2025 WL 2308483, at *4 (cleaned up). Defendant compiles extensive, non-anonymous profiles of users, sells or shares those profiles with the Partner Trackers, advertisers, and various websites, and maintains those profiles in an identity graph for its own business purposes. *See, e.g.*, FAC ¶¶ 47-59, 74-78, 88, 168, 183. The fact that Defendant's practices benefitted website publishers has no bearing on Defendant's status, because its "intentions or the use to which they put the information [it] obtained" is irrelevant to its status as a third party. *Taylor*, 2025 WL 2308483, at *4 (cleaned up). Instead, the emphasis is "the privacy concerns at issue with

having an unannounced second auditor listening in." *Id.* (citing *Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985); otherwise cleaned up).[6]

As to the ECPA, there is no caselaw that applies the "extension" approach (or the "capability approach") to the party exception. Instead, in *In re Facebook Internet Tracking Litig.*, 956 F.3d at 608, the Ninth Circuit held that the "simultaneous, unknown duplication and communication of GET requests do not exempt a defendant from liability under the party exception." This accords with the purpose of the ECPA, which is to "prevent the acquisition of the contents of a message by an unauthorized third-party or an unseen auditor." *Id.* (cleaned up). And as the Ninth Circuit noted, "[p]ermitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion, allowing the exception to swallow the rule." *Id*. Defendant's simultaneous acquisition of users' information (Argument § III.B, *supra*)—let alone its profiling of users for advertising purposes, like Meta did—easily fits this standard. Thus, Defendant is not exempt under the "party exception" to the ECPA. To the extent the Court decides to apply the "capability" or "extension" approach to the ECPA, the Court should apply the "capability" approach for the reasons set forth in *Taylor* and other authorities.

Last, notwithstanding the wrongness of the "extension approach," Defendant still qualifies as a third party under that standard. *Graham* outlined cases where SaaS providers would be third parties, such as in *Revitch* where "NaviStone was a marketing company that partnered with e-commerce sites to intercept visitor data and create marketing databases of consumer information," and *In re Facebook* where "Facebook tracked its users to third-party websites (through Facebook's code on the websites) … and then it sold that data to advertisers." *Graham*, 533 F. Supp. 3d at 832. Per the allegations laid out above, Defendant's conduct here is analogous if not identical to those mentioned in *Graham*, such as "creat[ing] marketing databases of consumer information" and selling "data to advertisers." Thus, even under this erroneous approach, Defendant is still a third party.

[6] That said, Plaintiffs allege that Defendant also violated Clause Three of CIPA § 631(a) by "using or attempting to use" the information contained in Plaintiffs' communication with the Websites. FAC ¶¶ 53, 59, 88, 186-189, 190, 243.

**D. The Crime-Tort Exception To The ECPA Applies**

Defendant contends that OpenX's website partners' consented to using the OpenX Tracker by installing it onto the websites, thereby negating Defendant's liability under the ECPA. *See* MTD at 20. Defendant then contends the crime-tort exception does not apply because it is engaged in allegedly "routine commercial behavior." *See* MTD at 20. Defendant is wrong.

There can be no violation of ECPA if "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(d). An exception to this exception exists, however, where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." *Id*. Courts have routinely found this "crime-tort" exception applies where plaintiffs "alleged that [technology companies] intercepted their communications for the purpose of associating their data with preexisting user profiles," that this "association of their data with preexisting user profiles violated state law" (*Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021)), and that the technology companies "benefited from this interception by using the information to sell ads to other third-party advertisers." *Marden v. LMND Med. Grp., Inc.*, 2024 WL 4448684, at *3 (N.D. Cal. July 3, 2024); *Shah v. Cap. One Fin. Corp.*, 768 F. Supp. 3d 1033, 1053 (N.D. Cal. 2025) ("Plaintiffs also allege that Defendant intercepted the contents of the electronic communications for an unauthorized purpose, which resulted in tortious acts. Because Defendant's actions are allegedly tortious, the one-party exemption does not apply.").

Plaintiffs have done exactly that. *See* FAC ¶¶ 23, 173, 184 (Defendant "uses the information it collects to link the user to a de-anonymized profile" on websites with the OpenX Tracker, such as the Bon Appetit and Covered California websites); *id.* ¶¶ 234-306 (alleging Defendant violates state and federal laws by intercepting and de-anonymizing user information to compile comprehensive user dossiers); *id.* ¶¶ 24-35 (explaining how Defendant monetizes the information by facilitating real-time bidding as an ad exchange).

That Defendant's conduct was related to commercial activity does not excuse its liability. As Judge Tigar recently held in a case like this one involving a data broker:

> [T]his Court is not persuaded that commercially exploiting unlawfully obtained information is 'licit' merely because it is profitable.
>
> …
>
> The existence of an underlying financial motivation does not mean that the act lacked a criminal or a tortious purpose. That's like saying that a bank robber's purpose was not to commit a crime—it was to make money.

*Riganian*, 791 F. Supp. 3d at 1090-91 (denying to "adopt any bright-line rule insulating financial motives from the crime-tort exception") (cleaned up). Judge Tigar is not alone in his reasoning. *See, e.g., R.S. v. Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *7 (C.D. Cal. Jan. 13, 2025) (finding under the alternate reading, "the ECPA would not prohibit a person from intercepting a communication with the intent to use that communication to blackmail so long as the ultimate reason for the blackmail was to make money"); *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 850 (E.D. Cal. 2025) ("financial[] motivate[ions] … do not immunize Defendants from liability under the ECPA"); *R.C*, 733 F. Supp. 3d at 901 (rejecting Defendant's reasoning); *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 928 (D. Minn. 2024) ("the Court has serious doubts that a pecuniary purpose and an injurious purpose can always be so clearly distinguished. And it defies common sense that a clearly harmful act could escape liability as long as it was done for profit."); *Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *6 (N.D. Ill. Feb. 21, 2025) ("the existence of a financial motivation is not a get-out-of-liability-free card").

Here, as in *Riganian*, Plaintiffs allege Defendant intercepted their communications with an unknown number of websites for the purpose of "monetize[ing]" the "collect[ed user] information and … comprehensive user profiles" through "sell[ing] that data to target advertising." FAC ¶¶ 24,186; *see also id.* ¶¶ 29-45, 77-90, 163-74, 175-85, 190-97. Thus, regardless of whether website operators consented to Defendant's behavior, the crime-tort exception applies. And because Plaintiffs and Class Members did not consent (*id.* ¶¶ 208, 223, 258, 304), Defendant remains liable.

## IV. PLAINTIFFS STATE A CLAIM FOR VIOLATION OF CIPA § 638.51

The CIPA defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a

wire or electronic communication is transmitted, but not the contents of a communication." Cal. Pen. Code § 638.50(b). With this broad language in mind, a court in this District has already found Defendant's Tracker is a "pen register." *Echeverria-Corzan*, 2025 WL 3128194, at *1. And courts have found trackers similar to Defendant's to also be "pen registers" at the pleadings stage. *See*, *e.g.*, *Riganian*, 791 F. Supp. 3d at 1093-94; *Deivaprakash*, 2025 WL 2541952, at *2-3; *Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *4-5 (N.D. Cal. Oct. 9, 2025); *Selby*, 2025 WL 2950164, at *4; *Lewis*, Ex. 1 at 21.

Against these authorities, Defendant regurgitates arguments that have been rejected by *the entire federal judiciary*. *Fregosa*, 2025 WL 2886399, at *2 ("Several judges in this district, including Judges Lin, Orrick, Pitts, Ryu, Tigar, and [Breyer], have held that such allegations suffice at the pleading stage."); *Bradshaw v. Lowe's Companies, Inc.*, 2025 WL 3171740, at *7 (S.D. Cal. Nov. 12, 2025) ("[T]he case law is not in Defendants' favor. Indeed, it uniformly supports the opposite outcome."). A number of state court decisions are in accord. *See*, *e.g.*, *Rose v. Variety Media, LLC*, 2025 WL 2794920, at *3 (Super. Ct. Los Angeles Cnty. Sept. 24, 2025); *Xu v. Reuters News & Media, Inc.*, 2025 WL 3035016, at *3 (Super. Ct. Santa Clara Cnty. Oct. 24, 2025); *Scarlett v. Future US, LLC*, 2025 WL 2614587, at *4 (Super. Ct. San Francisco Cnty. Sept. 5, 2025).

With that perspective in mind, Plaintiffs address each of Defendant's arguments below.

### A. Defendant's Tracker Records "Routing, Addressing, Or Signaling Information" Transmitted By Plaintiffs' Computers

Defendant argues that Plaintiffs' CIPA § 638.51 claim fails because a pen register cannot record a user's own information. MTD at 21 ("[T]he analog of the number dialed by a telephone here is the IP address and related information of a website accessed by a computer—but not the computer's own IP address or identifying information.") (cleaned up). Defendant's "argument finds no support in the legislative text, legislative purpose, or the growing body of" caselaw. *Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *4.

As courts have found, "[n]othing in the statutory definition limits pen registers to those that operate the same way as a traditional phone pen register." *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 924 (N.D. Cal. 2024). "All that is required is that the Trackers record addressing information

transmitted by the user's computer or smartphone in connection with the outgoing HTTP request to [the] website, regardless of whether that addressing information pertains to the sender or the recipient of the communication at issue." *Id.*; *see also*, *e.g.*, *Doe v. Talkiatry Management Servs., LLC*, 2025 WL 3190813, at *7 (C.D. Cal. Oct. 1, 2025) (rejecting argument that "Meta Pixel's tracking Plaintiff's own device's information falls outside the ambit of § 638.51") (cleaned up); *Camplisson v. Adidas Am., Inc.*, --- F. Supp. 3d ---, 2025 WL 3228949, at *8 (S.D. Cal. Nov. 18, 2025) ("Plaintiffs have sufficiently alleged that the Trackers record Class members' personal information, including the addressing information contained in an IP address, and thus plausibly constitute pen registers."); *Wright v. Truecare Prop. Holdings, LLC*, 2025 WL 3248749, at *4 (S.D. Cal. Nov. 21, 2025) ("Data capable of being associated with a user's identity falls within the statutory definition of addressing information."). Thus, it is immaterial whether the information collected is Plaintiffs' so long as it is associated with "the outgoing HTTP request to" a website, which it is here. *See*, *e.g.*, FAC ¶¶ 169 171, 180-183, 203, 212, 215.

Defendant's citation to *Aviles v. Liveramp, Inc.*, 2025 WL 487196 (Los Angeles Super. Ct. Jan. 28, 2025) is unpersuasive, as that court examined the legislative history rather than the plain text of the statute. *Garon v. Keleops USA, Inc.*, 2025 WL 2522374, at *5 (N.D. Cal. Sept. 2, 2025) (disagreeing with *Aviles* and other cases); *Rose*, 2025 WL 2794920, at *3 (finding several state court opinions unpersuasive because these cases give inadequate weight to the statutory text and structure"). In any event, as the *Lewis* court found, and as Plaintiffs allege here:

> the [OpenX] Tracker records Plaintiffs' movements across the internet as they move across the internet. To do so, the [OpenX] Tracker would necessarily have to capture destination information, more than plausibly including the dialing, routing, addressing, or signaling information from which a wire or electronic communication is transmitted.

*Lewis*, Ex. 1 at 21.

Defendant next contends that Plaintiffs' interpretation is not correct because "it is normal for websites to track the IP addresses of their visitors." MTD at 21 (cleaned up). But Plaintiffs' allegations here are not that a *website operator* violated the CIPA by recording their IP address only. Plaintiffs' allegations are that Defendant, a *third party data broker*, recorded their IP addresses and

other information for "profiling and advertising purposes." *Fregosa*, 2025 WL 2886399, at *7 ("Courts have rejected similar attempts to dismiss complaints when the allegations involved transmission of data to third parties."); *Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 930 (C.D. Cal. 2025) ("Plaintiff alleges that the tracking software captured more than just her IP address … and that this information was sent to third parties…"); *Drummer v. Costar Grp., Inc.*, 2025 WL 3190656, at *4 (C.D. Cal. Oct. 22, 2025) ("It is the *further* retention and transmission of their IP addresses that concerns Plaintiffs.") (emphasis in original); *In re Meta Pixel Tax Filing Cases*, 793 F. Supp. 3d 1147, 1152 (N.D. Cal. 2025) ("A more apt example derived from plaintiffs' allegations would involve a prosecutor who purchased a pen register, handed that pen register to a police officer and then instructed the police officer to install … and further aided the officer in doing so."). The recording of user information by third parties like Defendant does not involve "basic internet function[ality]." *Drummer*, 2025 WL 3190656, at *4.

Thus, Defendant's Tracker records and decodes "routing, addressing, and signaling information" transmitted by Plaintiffs' computers.

### B. The CIPA Covers Internet Trackers Per The Plain Text, Weight Of Authority, And Legislative History

Defendant next contends "[t]he statute's legislative history underscores that this provision [of the CIPA] does not apply to web pixels." MTD at 22. But "the text of a law controls over purported legislative intentions unmoored from any statutory text," and "the Court may not replace the actual text with speculation as to Congress' intent." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024); *Prang v. Los Angeles County Assessment Appeals Board*, 15 Cal.5th 1152, 1180 (2024) ("Where statutory text is unambiguous and provides a clear answer, courts need go no further."). Here, the plain text is clear: "[t]he statutory text is deliberately expansive, designed to encompass new technologies and apply to conduct like that alleged here." *Fregosa*, 2025 WL 2886399, at *9. Indeed, "[i]f the drafters of Section 638.50 had intended for 'pen register' to be limited to telephone technologies, they knew how to do so—as evidenced by other sections of CIPA where they imposed such limitations." *Gabrielli v. Motorola Mobility LLC*, 2025

WL 1939957, at *11 (N.D. Cal. July 14, 2025) (citing Cal. Penal Code §§ 631(a) (clause one), 632.7)).

Based on this plain text, as noted above, the *entire federal judiciary* has held trackers like Defendant's can be "pen registers." *Id.*, at *2; *Bradshaw*, 2025 WL 3171740, at *7; *see also*, *e.g.*, *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3 (N.D. Cal. Dec. 12, 2024) (rejecting argument that a pen register must be "telephone technology") (cleaned up); *Garon*, 2025 WL 2522374, at *4 (same); *Moody v. C2 Educational Systems Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) (same); *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 41 (S.D.N.Y. 2025) (same); *Selby*, 2025 WL 2950164, at *4 (same).

Defendant's citation to a different provision of the CIPA—Cal. Pen. Code § 638.52—does not affect this analysis. MTD at 22. As every federal court has held, that section "merely lists requirements relating to a particular type of pen register … But that does not alter the statutory definition of a pen register stated in § 638.50(b)." *Shah*, 754 F. Supp. 3d at 930; *Moody*, 742 F. Supp. 3d at 1076 ("Though § 638.52 refers to pen registers and trap and trace devices as physically attached to telephone lines, the definitions set forth under § 638.50 do not state any such requirement."); *Walsh v. Dollar Tree Stores, Inc.*, 2025 WL 2939229, at *18 (N.D. Cal. Oct. 16, 2025) ("[T]his, too, is insufficient to override the clear definition in Section [6]38.50(b) and the Court agrees with the *Shah* court's opinion reconciling these sections."); *Lesh*, 767 F. Supp. 3d at 41 ("The Court will not read the term "telephone" into Section 638.50 just because the word is used in another section of the statute that bears little relevance here."); *Drummer*, 2025 WL 3190656, at *5 n.2 ("Section 638.52 perhaps does not apply to pen registers that collect IP addresses and only to pen registers that collect telephone information, which further undermines any authority Section 638.52 would have in invalidating Plaintiffs' allegations.").[7]

[7] Defendant frets that "Plaintiffs' illogical interpretation of the statute would require every advertising pixel on the internet to be approved by a court order." MTD at 22. Not so. Courts have long held the consent of a party "[i]s a complete defense to his invasion of privacy claim. *TBG Ins. Serv. Corp. v. Super. Ct.*, 96 Cal. App. 4th 443, 450 n.5 (2002); *Lesh*, 767 F. Supp. 3d at 42-43 (evaluating, although rejecting, consent defense to a CIPA § 638.51 claim). Regardless, Defendant's argument belongs in the legislature, not the courts. *Lewis*, Ex. 1 at 22.

Again, Defendant cites a trio of state court cases that examined the legislative history rather than the plain text of the statute. *See*, *e.g.*, *Garon*, 2025 WL 2522374, at *5 (disagreeing with *Licea*, *Sanchez*, *Aviles* and other cases); *Riganian*, 791 F. Supp. 3d at 1094 (disagreeing with *Sanchez* because it "focused its analysis on the legislative history of the CIPA rather than on the expansive, plain language of Section 638.50"). These state court also "appear to be based on far less comprehensive complaints than those submitted by Plaintiffs." *Drummer*, 2025 WL 3190656, at *4 n.1.

Even including legislative history, Defendant is wrong. "In enacting the Invasion of Privacy Act, the Legislature declared in broad terms its intent to protect the right of privacy of the people of this state from what it perceived as a serious threat to the free exercise of personal liberties that cannot be tolerated in a free and civilized society." *Smith v. LoanMe*, 11 Cal. 5th 183, 199 (2021) (cleaned up). "In light of this intent, the California Supreme Court has instructed courts to interpret CIPA in the manner that 'fulfills the legislative purpose of CIPA by giving greater protection to privacy interests.'" *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016) (Koh, J.) (quoting *Flanagan v. Flanagan*, 27 Cal. 4th 766, 775 (2002); otherwise cleaned up). Thus, the CIPA's "language, structure, history, and purpose are sufficiently clear, and … [t]he statutory text is *deliberately* expansive, designed to encompass new technologies and apply to conduct like that alleged here." *Fregosa*, 2025 WL 2886399, at *9 (emphasis added); *Shah*, 754 F. Supp. 3d at 933 ("The pen register statute is broadly written, and under California law, is to be interpreted broadly to protect privacy and to be applied to new techniques and technologies.").

The AB 929 materials Defendant references "merely describe traditional telephone-based pen registers as being among the variety of electronic tools used by law enforcement to apprehend criminals in this age of rapidly changing technology. Nowhere in those materials did the Legislature state an intent to add a statutory requirement limiting pen registers to those traditional forms." *Shah*, 754 F. Supp. 3d at 930 n.2 (cleaned up).

### C. The CIPA And CCPA Do Not Conflict, And The CIPA Applies Regardless Under The CCPA's Plain Text

Defendant last argues that the CIPA cannot encompass Defendant's conduct because that would "create conflict between the California Penal Code and the California Consumer Privacy Act ("CCPA"). MTD at 23. Defendant's argument is based on a fallacy. The CCPA provides Californians with a right to opt-out of *further* data collection. And it does regulate entities like Defendant. But that does *not* mean that the CIPA permits companies like Defendant to collect and disclose Californians' data without procuring consumer's consent or even telling them in the first place. Quite the contrary, the CCPA states that "[a] business that controls the collection of a consumer's personal information shall, *at or before the point of collection*, inform consumers of" the types of data collected. Cal. Civ. Code § 1798.100(a) (emphasis added). This is no different than the CIPA.

Thus, the "CCPA and CIPA are complementary." *Mirmalek*, 2025 WL 5102709, at *5; *Xu*, 2025 WL 3035016, at *3("[I]t does not appear that CCPA and CIPA are in conflict with one another."); *Rose*, 2025 WL 2794920, at *4 ("The Court does not see any problem, at this stage, with the overlap, if any, between CCPA and CIPA.").

Even if there were a conflict between the statutes (and there is not), the plain text of the CCPA states that "in the event of a conflict between other laws and the provisions of this title, the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control." Cal. Civ. Code. § 1798.175. According to Defendant, there is a conflict because the CIPA prohibits conduct that the CCPA allegedly permits. "Thus, by Defendant's own argument, CIPA should control." *Mirmalek*, 2025 WL 5102709, at *5; *Xu*, 2025 WL 3035016, at *3 ("Even if there was a conflict, the explicit language of the CCPA states that the law which affords the greatest protection should control. For this case, that law is the CIPA.").

## V. PLAINTIFFS STATE A CLAIM FOR UNJUST ENRICHMENT

Defendant argues "[b]ecause Plaintiffs' unjust enrichment claim sounds in equity and exclusively provides for equitable relief, that claim must be dismissed" under *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). MTD at 23. This is wrong.

"In *Sonner*, the panel considered whether the district court properly dismissed a plaintiff's equitable claim for restitution following the voluntarily dismissal of her sole legal claim on the eve of trial." *Collyer v. Catalina Snacks Inc.*, 712 F. Supp. 3d 1276, 1289 (N.D. Cal. 2024) (cleaned up). "The Ninth Circuit clarified that a plaintiff 'must establish that she lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL and CLRA." *Id.* (cleaned up). The *Sonner* "court ultimately held that the plaintiff failed to show that she lacked an adequate legal remedy because, in large part, she conceded that she sought the same sum in equitable restitution … as she requested in damages to compensate her for the same past harm." *Id.* (cleaned up).

"This case, however, is at the pleading stage," and "decisions in this district [] allow the pursuit of alternative remedies at the pleadings stage." *Id.*; *see also Lewis*, Ex. 1, at 24 ("Plaintiffs may seek equitable remedies in the alternative at the pleading stage, foreclosing Defendant's argument that Plaintiffs cannot plead a claim for unjust enrichment based on the presence of legal claims."); *Cabot v. Lectric eBikes LLC*, 2025 WL 2256328, at *2 (N.D. Cal. Aug. 7, 2025) ("At the pleading stage, where plaintiffs may seek relief in the alternative or different types of relief, this is sufficient to allege that Cabot lacks an adequate remedy at law—and thus, that Cabot may be entitled to restitution."); *Harris v. McDonald's Corp.*, 2021 WL 2172833, at *3 (N.D. Cal. Mar. 24, 2021) ("[Defendant's] argument that *Sonner* ... requires rejection of the equitable claims at the pleading stage is not persuasive."); *Murphy v. Olly Pub. Benefit Corp.*, 651 F. Supp. 3d 1111, 1129 (N.D. Cal. Jan. 17, 2023) (finding that plaintiffs' allegations that legal remedies were not as certain as equitable remedies to be sufficient to survive a motion to dismiss). Plaintiffs bring their unjust enrichment claim in the alternative, which is sufficient at the pleading stage.

## VI. TO THE EXTENT THE COURT GRANTS THE MOTION (AND IT SHOULD NOT), PLAINTIFFS SHOULD BE PERMITTED LEAVE TO AMEND

Should the Court grant Defendant's Motion (which it should not), Plaintiffs respectfully request leave to amend. Despite Defendant's assertion that Plaintiffs' claim is futile (which it is not), the Ninth Circuit has consistently granted plaintiffs leave to amend regardless of multiple previously amended pleadings. *See Roney v. Miller*, 705 F. App'x 670, 671 (9th Cir. 2017) (holding lower court erred in denying leave to amend after dismissing first amended complaint); *United States v. United*

*Healthcare Ins. Co.*, 848 F.3d 1161, 1183 (9th Cir. 2016) (reversing denial of leave to amend even though the plaintiff had previously amended his pleading three times). This is especially true where, as here, the Court has not yet ruled on the merits of Defendant's arguments or Plaintiffs' allegations.

Furthermore, the Ninth Circuit has emphasized that "[u]nder futility analysis, dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011) (cleaned up); *see also Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (noting that a court should permit amendment "unless it determines that the pleading could not possibly be cured by the allegation of other facts"). Here, it is far from certain that Plaintiffs' claim is futile. As noted throughout this brief, numerous courts have sustained claims similar to those here, and even without allegations related to data brokers and real-time bidding. Thus, should the Court grant Defendant's Motion (and it should not), Plaintiffs respectfully request leave to amend to cure defects in the allegations.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion. If the Court grants the Motion in any respect, Plaintiffs respectfully request leave to amend.

Dated: December 12, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Philip L. Fraietta*
Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700

E-mail: klynn@bursor.com
jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10069
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiffs*