**BURSOR & FISHER, P.A**.
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-mail: mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
      jwilner@bursor.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KRISTIN COBBS, DILARA USKUP, and CHRISTIAN CALCINES, individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br>  v.<br><br>OPENX TECHNOLOGIES, INC.,<br><br>           Defendant. | Case No. 3:25-cv-05588-SI<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>**<br><br>Hon. Susan Illston |

# TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION ......................................................................................................1

THE PARTIES .........................................................................................................................1

JURISDICTION AND VENUE ................................................................................................2

FACTUAL ALLEGATIONS ....................................................................................................2

I.   DATA BROKERS AND REAL-TIME BIDDING: THE INFORMATION ECONOMY ...................................................................................................................2

   A.   Data Brokers ...........................................................................................................2

   B.   Real Time Bidding ..................................................................................................7

   C.   Cookie Syncing .....................................................................................................12

II.  AN OVERVIEW OF DEFENDANT'S SERVICES ...........................................................16

   A.   OpenX ...................................................................................................................16

   B.   OpenX's Online Tracking Technology .................................................................19

   C.   Persistent Identifiers .............................................................................................24

      1.   IP Addresses ...............................................................................................26

      2.   Universal Resource Locator ........................................................................29

      3.   Mobile Advertising Identifiers ...................................................................30

      4.   Other Identifiers..........................................................................................36

   D.   Identity Resolution ...............................................................................................38

III. DEFENDANT'S TRACKERS ARE PRESENT ON EACH OF THE SUBJECT WEBSITES AND ACROSS THE INTERNET ................................................................39

   A.   Bon Appetit ...........................................................................................................40

   B.   Covered California ................................................................................................42

IV.  DEFENDANT'S SERVICES DEANONYMIZE USERS AND ENRICH DEFENDANT AND THE WEBSITE OPERATORS THROUGH REAL-TIME BIDDING AND PROFILING INDIVIDUALS........................................................45

   A.   Defendant Combines The Data From The Subject Websites With Other Data To Deanonymize Users........................................................................45

   B.   The Partner Trackers Use The Profiles Created By Defendant To Enhance Their Advertising And Analytics Services ..............................................46

V.    PLAINTIFFS' EXPERIENCES ...............................................................................47

     A.    Plaintiff Kristin Cobbs.........................................................................47

     B.    Plaintiff Dilara Uskup..........................................................................49

     C.    Plaintiff Christian Calcines..................................................................50

CLASS ALLEGATIONS ....................................................................................................53

CAUSES OF ACTION.......................................................................................................55

     COUNT I .........................................................................................................55

     COUNT II.........................................................................................................57

     COUNT III .......................................................................................................60

     COUNT IV .......................................................................................................62

PRAYER FOR RELIEF .....................................................................................................65

JURY TRIAL DEMANDED ..............................................................................................65

Plaintiffs Kristin Cobbs, Dilara Uskup, and Christian Calcines ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Open X Technologies, Inc. ("OpenX" or "Defendant").  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegation specifically pertaining to themselves, which are based on personal belief.

## NATURE OF THE ACTION

1.      This class action lawsuit sets forth how OpenX surveils of millions of Americans through their activity on the Internet and mobile applications. OpenX, through its software products, tracks in real time and records indefinitely the personal information and specific web activity of hundreds of millions of Americans.

2.      This unlawfully collected information is worth billions of dollars to Defendant because it makes up the content of Defendant's Open Audience and creates individual sales of advertisements in the real-time-bidding ecosystem present on thousands of major websites where Defendant's services are installed.

3.      Plaintiffs bring this action to enforce their constitutional rights to privacy and to seek damages under Federal and California law for the harm caused by the collection and sale of their confidential data and personal information.

## THE PARTIES

4.      Plaintiff Kristin Cobbs is a natural person and citizen of California, residing in San Francisco, California.  Plaintiff Cobbs was in California when she accessed the Covered California website and had her activity on that website and subsequent activity on other websites tracked by Defendant.

5.      Plaintiff Dilara Uskup is a natural person and citizen of California, residing in Los Angeles, California.  Plaintiff Uskup was in California when she accessed websites where Defendant's tracker collected information and loaded cookies on her browser and had her activity on those websites and subsequent activity on other websites tracked by Defendant.

6.      Plaintiff Christian Calcines is a natural person and citizen of California, residing in Thousand Oaks, California.  Plaintiff Calcines was in California when he accessed the Bon Appetit

website and had his activity on that website and subsequent activity on other websites tracked by Defendant.

7. Defendant OpenX Technologies, Inc., is a Delaware corporation with its principal place of business at 888 E. Walnut Street, 2nd Floor, Pasadena, CA 91101. OpenX an ad exchange for buyers and sellers of web ads to make instant transactions.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

9. This Court has general personal jurisdiction over Defendant is headquartered in California. Further, Defendant did not object to personal jurisdiction in its motion to dismiss and so waived that defense.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District and Plaintiff Cobbs resides in this District. Further, Defendant did not object to venue in its motion to dismiss and so waived that defense.

## FACTUAL ALLEGATIONS

### I. DATA BROKERS AND REAL-TIME BIDDING: THE INFORMATION ECONOMY

11. To put the invasiveness of Defendant's privacy violations into perspective, it is important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

12. As a preliminary matter, OpenX is a registered data broker[1] in California and operates as a Sell-Side Platform (SSP)[2] and an ad exchange, as explained in further detail *infra*.

### A. Data Brokers

13. While "[t]here is no single, agreed-upon definition of data brokers in United States

---

[1] *Data Broker Registration for OpenX Technologies, Inc.*, Office of the Attorney General, https://oag.ca.gov/data-broker/registration/193614 (last accessed Feb. 18, 2025).

[2] *Top SSP Platforms To Watch For in 2024*, SMARTYADS, https://smartyads.com/blog/top-ssp-platforms (describing OpenX as one of the "top 10 SSP platforms").

law,"[3] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  Cal. Civ. Code § 1798.99.80(c).

14.     Any entity that qualifies as a "data broker" under California law must specifically register as such (Civ. Code § 1798.99.82(a)), which OpenX does.[4]

15.     "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[5]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."  And whereas individual data sources "may provide only a few elements about a person's activities, data brokers combine these elements to form a detailed, composite view of the consumer's life."[6]

16.     For instance, as a report by NATO found, data brokers, like Defendant, collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited.[7]  Inferred data "is gleaned from observed data by modelling or profiling," meaning what consumers may be *expected* to do.[8]  On top of this, "[b]rokers

[3] Justin Sherman, *Data Brokers and Sensitive Data on U.S. Individuals: Threats to American Civil Rights, National Security, and Democracy*, DUKE SANFORD CYBER POLICY PROGRAM, at 2 (2021), https://techpolicy.sanford.duke.edu/wp-content/uploads/sites/4/2021/08/Data-Brokers-and-Sensitive-Data-on-US-Individuals-Sherman-2021.pdf.

[4] DATA BROKER REGISTRATION FOR OPENX TECHNOLOGIES, INC., https://oag.ca.gov/data-broker/registration/193614.

[5] *Id.*

[6] Tehila Minkus et al., *The City Privacy Attack: Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM CONFERENCE ON ONLINE SOCIAL NETWORKS, at 71, (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[7] Henrik Twetman & Gundars Bergmanis-Korats, *Data Brokers and Security*, at 11, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[8] *Id.*

typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[9]

17.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[10]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[11]

18.    This data collection has grave implications for Americans' right to privacy.  For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[12]

19.    As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights.  Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.
>
> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements.  Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.
>
> …

---

[9] Id.

[10] Sherman, supra note 6, at 1.

[11] Id.

[12] Id. at 9.

Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[13]

20.    Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving consumers of the right to control who does and



---

[13] *Id.*

does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[14]

21.    In the modern age, these threats are far too real.  For instance, the gunman who assassinated a Minnesota state representative and her husband "may have gotten their addresses or other personal details from online data broker services, according to court documents."[15]  Similarly, following the protests in Los Angeles:

> Tech-skeptical California lawmakers and activists fear the Trump administration will leverage tech tools to track and punish demonstrators accused of interfering with Immigration and Customs Enforcement raids. One possible instrument at ICE's disposal: location data, a highly detailed record of people's daily movements that's collected and sold by everything from weather apps to data brokers.[16]

22.    Data brokers, like Defendant, are able to compile such wide swaths of information in part by collecting users' IP addresses and other device information, which is used by data brokers like Defendant to track users across the Internet.[17]  Indeed, as McAfee (a data security company) notes, "data brokers … can even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[18]

23.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you.  They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single."  Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[19]

---

[14] Twetman & Bergmanis-Korats, *supra* note 9, at 8.

[15] Lily Hay Newman, *Minnesota Shooting Suspect Allegedly Used Data Broker Sites to Find Targets' Addresses*, WIRED (June 16, 2025), https://www.wired.com/story/minnesota-lawmaker-shootings-people-search-data-brokers/.

[16] Tyler Katzenberger, *LA Protests Fuel California Drive To Hide Data From Trump*, POLITICO (June 11, 2025), https://www.politico.com/news/2025/06/11/la-protests-california-hide-data-trump-00400127

[17] *Id*. at 11.

[18] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE, (Jan. 28, 2025), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[19] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS, (May 10, 2022), https://usefathom.com/blog/data-brokers.

24.     In short, data brokers like Defendant track consumers across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.  The "highest bidder" is a literal term, as explained below.

**B.      Real Time Bidding**

25.     So, once data brokers, like Defendant, collect information from consumers and create comprehensive user profiles, how does Defendant "sell" or otherwise monetize that information?  This is where real-time bidding comes in, and Defendant, as an ad exchange, facilitates it.

26.     "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[20]

27.     "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)."[21]  An SSP "work[s] with website or app publishers to help them participate in the RTB process."[22]  "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[23]  And an Advertising Exchange "allow[s] advertisers and publishers to buy and sell ad inventory directly through real time bidding, and without the need to have an intermediary involved in the transaction.  This model offers several benefits for advertisers and publishers including transparency, flexibility, and a greater degree of control over their inventory."[24]

28.     In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.  Defendant plays crucial roles in this process as a data broker, an SSP, and an Advertising Exchange.

[20] Sara Geoghegan, *What is Real Time Bidding?,* ELECTRONIC PRIVACY INFORMATION CENTER, (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] Brock Munro, *What is an Ad Exchange and How Does It Work,* PUBLIFT, (Feb. 28, 2025), https://www.publift.com/blog/what-is-an-ad-exchange.

29. The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[25]



30. Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about consumers to procure the greatest interest from advertisers and obtain the highest bids for websites and app operators' users. But these SSPs and DSPs receive assistance by connecting with Data Management Platforms ("DMPs") or data brokers like Defendant:

> the economic incentives of an auction mean that DSP with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or data broker]. DSPs send bid requests to DMPs [or data brokers],

---

[25] Geoghegan, *supra*; *see also Real-Time Bidding*, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP also wins the right to cookie sync its own cookies



with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[26]

31.    In other words, before bidding to show a user an advertisement, a DSP will attempt to determine what other information about a user may be available. A DSP does this by connecting with entities like Defendant, who match a consumer's information from a particular website or mobile application (*e.g.*, their IP address) with any profiles on those users Defendant may have compiled. If there is a match, then advertisers will pay more money to show users an advertisement because the advertisers have more information to base their targeting on. This naturally enriches website and app operators, as their users are now more valuable. And, a DSP is able to continue linking users on a website or mobile application through the Advertising Exchange, which enhances the DSP's ability to better identify users in the future and helps the DSP profit further as well.

32.    As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

> (a)    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, website and app operators] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

---

[26] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

(b)    "send[ing] sensitive data across geographic borders."

(c)    sending consumer data "***to potentially dozens of bidders simultaneously***, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[27]

33.    The last point bears additional emphasis, as it means the data Defendant provides to DSPs to serve targeted advertisements is even provided to those entities who do not actually serve an advertisement on a consumer. This greatly diminishes the ability of users to control their personal information.

34.    Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[28]

---

[27] Office of Technology & Division of Privacy and Identity Protection, *Unpacking Real Time Bidding through FTC's case on Mobilewalla*, FEDERAL TRADE COMMISSION, (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[28] Geoghegan, *supra*.

35.    For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[29]:

36.    All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one statutes like the CIPA were enacted to protect against.  *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person."); *Selby v. Sovrn Holdings, Inc.*, 2025 WL 2950164, at *3 (N.D. Cal. Oct. 17, 2025) (finding a "highly offensive privacy intrusion" and "injury for the purposes of CIPA" where "Plaintiffs have alleged that Sovrn engages in unauthorized widespread tracking and data collection, allowing it to



compile detailed profiles of each Plaintiff's online web browsing activity—including highly sensitive browsing activity—tied to their email address and other personal identifiers") (cleaned up); *Deivaprakash v. Condé Nast Digital*, --- F. Supp. 3d ---, 2025 WL 2541952, at *4 (N.D. Cal. Sept.

[29] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

4, 2025) (finding standing for the purpose of CIPA and "likely [] Article III" where the collection of IP addresses and other identifiers "allowed the third parties to: (1) build a profile reflecting [plaintiff's] personal information; and (2) interfere with [plaintiff's] ability to remain anonymous").

### C.    Cookie Syncing

37.    It should now be clear both the capabilities of data brokers like Defendant (third parties who de-anonymize users by linking users' IP addresses and other information to non-anonymous profiles), and the reasons that Defendant's technology is installed on websites (to provide more information to advertisers in real-time bidding so that websites can receive more money for their users).  The final question is how does Defendant share information with other services to offer the most complete user profiles up for sale?  This occurs through "cookie syncing."

38.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[30] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other['s] cookies, in order to better facilitate targeting and real-time bidding."[31]

39.    Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future.  Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com.  Thus, advertiser.com does not (and cannot) know which users visit website3.com.  However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

---

[30] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[31] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

> …
>
> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[32]

//

//

//

//

//

//

//

//

---

[32] Papadopoulos, *supra*, at 1433.



40.     Through this process, third party trackers like Defendant's are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[33]

41.     On the flip side, "CSync may re-identify web users even after they delete their cookies."[34]  "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[35]  But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure.

---

[33] Papadopoulos, *supra*, at 1434.

[34] *Id.*

[35] *See id.*

Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[36]

42.    Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[37]

43.    Cookie syncing is precisely what is happening here. When Defendant's cookies are installed on users' browsers, they are syncing their unique user identifiers with other third parties on the websites (*e.g.*, the Partner Trackers).[38] The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from being anonymous when they visit websites.

*        *        *

44.    To summarize the proceeding allegations, Defendant is a data broker that focuses on collecting as much information about users as possible to create comprehensive user profiles. When Defendant collects user information like IP addresses or device identifiers, users can be linked to these profiles, which contain both users' non-anonymous information (*e.g.*, e-mail addresses) and various categories of users' interests and even socio-political views. Through "cookie syncing," those profiles are shared by Defendant with other entities (and vice versa) to form the most fulsome picture with the most attributes as possible. And through that same process, those profiles are offered up for sale to interested advertisers through real-time bidding, where users will command more value the more advertisers know about a user. Thus, Defendant enriches the value that website users would otherwise command by tying the data they obtain directly from users on websites with comprehensive user profiles in their possession or in the possession of other entities they sync with.

45.    Accordingly, Defendant is using its Trackers in conjunction with website operators and other third parties to (i) de-anonymize users, (ii) offer users up for sale in real-time bidding, and

[36] *Id.*

[37] *Id.* at 1441.

[38] The "Partner Trackers" shall refer to any of the third party trackers with whom OpenX syncs its Trackers on any particular website, including but not limited to Microsoft's Adnxs tracker and Google's DoubleClick tracker (alleged below).

(iii) allow website operators to maximum revenue by installing Defendant's Trackers and allowing the Defendant to collect as much information about users as possible (without consent).

46.    Of course, Defendant also benefits from this arrangement because websites and apps will want to employ Defendant's services to bring in more advertising revenue, meaning Defendant can continue to expand and grow the information they have about any consumers and add to consumers' profiles, which further perpetuates the value of Defendant's services.

47.    As it stands though, Defendant is already one of the largest players in this industry. Defendant achieved this status using a variety of technologies and services, as described below.

## II.    AN OVERVIEW OF DEFENDANT'S SERVICES

### A.    OpenX

48.    Defendant OpenX—who, as noted above, is a registered data broker in California[39]— was founded in 2008 by Damon Reeve, Jason Fairchild, and Scott Switzer[40] "as an ad exchange for buyers and sellers of web ads to make instant transactions."[41]

49.    OpenX describes itself as the "[l]argest [i]ndependent [e]xchange," with over 1,200 premium publishers, at least 50,000 mobile apps, and tens of thousands of demand-side partners (i.e., buyers of ad inventory consisting of advertisers, advertising agencies, and advertising networks) participating in the exchange.

50.    OpenX, as a programmatic ad exchange,[42] helps other companies "utilize their [first party] data, leverage [third party data], and package up audiences for marketers that will drive ad revenue."[43]

---

[39] *Data Broker Registration for OpenX Technologies, Inc.*, Office of the Attorney General, https://oag.ca.gov/data-broker/registration/193614 (last accessed Feb. 18, 2025).

[40] *OpenX IPO*, FORGE, https://forgeglobal.com/openx_ipo/.

[41] Natalie Jarvey, *OpenX Raises $22 Million for Mobile Expansion*, LOS ANGELES BUSINESS JOURNAL (Jan. 17, 2013), https://labusinessjournal.com/technology/openx-raises-22-million-mobile-expansion/.

[42] Dan Hughes, *The Beginner's Guide to Programmatic Advertising*, DIGITAL MARKETING INSTITUTE (Mar. 11, 2024), https://digitalmarketinginstitute.com/blog/the-beginners-guide-to-programmatic-advertising#heading_52480 ("Programmatic ad buying is the use of software to buy digital advertising. While the traditional method includes requests for proposals, tenders, quotes, and negotiation, programmatic buying uses algorithmic software to buy and sell online display space.").

[43] *OpenAudience*, OPENX, https://www.openx.com/why-openx/openaudience/ (last accessed Jan. 27, 2025).  First-party data is data that websites "collect directly from [their] customers," while third-party data is data that is "acquire[d] from a data aggregator" that does "not collect data directly but

---

51.     OpenX takes this data and uses it to "match [a company's] audience against [OpenX's] graph to put users in audience segments that [OpenX] mak[es] available to marketers."[44]

52.     The OpenX Ad Exchange supports a variety of "targeting" criteria used by publishers and advertisers to identify ad space where buyers want ads to be served.

53.     "Targeting" involves the collection of data about consumers, their identities, and their devices, including mobile phones. OpenX's business relies on collecting data that its partners want to use to learn about consumers and maximize the buyers' advertising dollars.

54.     In other words, OpenX compiles comprehensive user profiles by tracking users across the Internet.  OpenX then augments the information of its client's end users with the profile data to make that information more valuable to advertisers by aggregating that information into a graph, thereby driving advertisers' revenue.

55.     As of 2019, OpenX became "the first ever major exchange" to "bring people-based marketing to the open web" such as that OpenX was able to "eliminate any barrier or caps on the number of data points or unique identities utilized."[45]

56.     This decision was done for "improving performance, scalability, speed, and global reach while accelerating new product development."[46]  Indeed, OpenX's network has a vast reach.

57.     To date, OpenX has collected at least 800 million hashed emails,[47] 200 million hashed phone numbers, over 200 million US users instrumented for data and identity, 48 million CTV

---

obtain[s] it from other companies and compile[s] it into a single dataset."  WHAT IS THE DIFFERENCE BETWEEN FIRST-PARTY, SECOND-PARTY AND THIRD-PARTY DATA?, CUSTOMER DATA PLATFORM RESOURCE, https://tinyurl.com/2htc6a8n.

[44] *Data Activation*, OpenX, https://www.openx.com/why-openx/openaudience/.

[45] *OpenX Announces First of Its Kind Five Year Collaboration with Google Cloud That Will Form The Foundation of New Product and Technology Strategy*, OPENX (Jan. 24, 2019), https://www.openx.com/press-releases/92648/.

[46] *See OpenX: Powering the future of advertising with Google Cloud*, GOOGLE CLOUD, https://cloud.google.com/customers/openx (last accessed May 12, 2025).

[47] For an explanation on "hashed" information and why hashed information is personally identifiable, *see infra*.

---

[Connected TV][48] users instrumented for data and identity, over 5,000 requests per user per month, and 3,000 third party data attributes available for targeting.[49]

58.    OpenX has aggregated these inputs into what it calls an "Identity Graph," which allows advertisers to connect individuals to all the devices those individuals use for the purpose of delivering targeted advertisements.[50]

59.    OpenX has an "identity graph of more than 200 million unique people."[51]

 **Match**

Integrate your first-party data, or any pre-built audience segments, and seamlessly match to our identity graph of more than 200 million unique people.

 **Enrich**

Make your data more useful with more than 3,000+ sortable fields, including consumer habits, lifestyle, spend, and more. Refine your data and get more granular, or expand your audience and create look-alikes.

 **Activate**

Data and audience segments are useful only if you can run campaigns against them. We'll give you a simple Deal ID that you can use with the DSP of your choice to reach your audiences across our premium supply.

60.    OpenX also uses these individual profiles to provide marketers with curated packages that identify and target specific customers.[52]  Indeed, OpenX notes it can "help you understand what audience segments are on your site and give you packages that your in-house team can take directly to marketers."[53]

61.    OpenX splits this up into two different types of packages.  The first are inventory packages that allows marketers to "[s]howcase [their] brand alongside brand-safe inventory across [OpenX's] network of trusted publishers, reaching consumers *wherever* and *whenever* they engage

---

[48] A "Connected TV" ("CTV") is "[a] TV set that is connected to the Internet."  AUTHORIZED BUYERS HELP | AUTHORIZED BUYERS HELP, GOOGLE, https://support.google.com/authorizedbuyers/answer/7048954?hl=en.

[49] *Data Activation*, OPENX, https://www.openx.com/why-openx/openaudience/ (last accessed May 12, 2025).

[50] *See* DATA ACTIVATION, OPENX, https://www.openx.com/why-openx/openaudience/ ("The OpenX identity graph helps you identify, reach, and engage your perfect audience.")

[51] *Id.*

[52] CURATED PACKAGES, OPENX, https://www.openx.com/curated-packages/.

[53] *Id.*

with their favorite content."[54]  The second are data driven packages that "[e]ngage customers with packages powered by data-driven curation, and drive performance on brand-safe inventory. [Allowing companies, like Defendant to e]ffortlessly choose from pre-built packages powered by audience, contextual, attention, or sustainability data and [OpenX's] proprietary identity graph."[55]

62.    By way of example, OpenX sells a "Cold & Flu Package" that targets consumers "looking to prevent and treat illness this cold and flu season."[56]

63.    Despite having access to nearly three-quarters of all Americans' identities,[57] OpenX is a bad actor and has violated thousands of individuals' privacy rights.  Despite the national impact of OpenX's privacy violations, OpenX has only received a slap on the wrist.

64.    For example, in 2021, OpenX paid $2 million to the FTC to "settle allegations that the company violated federal children's privacy law" including that "[OpenX was] accused of knowingly collecting information from hundreds of apps marketed for children, toddlers and for preschool learning, before passing this data — including granular location data, IP addresses and unique device identifiers — to third parties that used the data for targeted advertising."[58]

65.    OpenX continues to violate privacy rights for the simple reason that it is more profitable than complying with the law.  OpenX announced $172 million in revenue in 2017 alone.[59]

### B.    OpenX's Online Tracking Technology

65.    OpenX provides services for a massive web of online tracking technologies that, in turn, provide ongoing information to OpenX (the "OpenX Trackers" or "Trackers").

---

[54] *Id.* (emphasis added).

[55] *Id.*

[56] COLD & FLU, OPENX, https://www.openx.com/curated-packages/cold-flu/

[57] *See infra.*

[58] Carly Page, *Ad exchange OpenX slapped with FTC fine for collecting location data on children*, TECHCRUNCH, https://techcrunch.com/2021/12/16/ad-exchange-openx-hit-with-fine-for-collecting-location-data-on-children/.

[59] *OpenX Reports More Than $170 Million in 2017 Revenue*, OPENX (Mar. 13, 2018), https://www.openx.com/news/openx-reports-170-million-2017-revenue/#.

66.    It is estimated that OpenX collected information on 0.77% of all web traffic.[60]  To put this in perspective, OpenX "process[es] more than one trillion transactions globally each day."[61]

67.    Moreover, OpenX's ad exchange reaches nearly three-quarters of all Americans: "OpenX works with more than 30,000 advertisers across every screen and device, reaching nearly one billion consumers—including a quarter billion unique consumers in the US."[62]

68.    OpenX collects highly detailed, invasive data, including but not limited to data that it collects through DMPs and DSPs.  DMPs and DSPs help OpenX collect behavior and profile data.

69.    Behavior data "usually comes from the user's actions and content consumption. This can include data collected from page visits, visits to the advertiser's site, visits to other sites, ad clicks, videos viewed, apps used, games played, social posts, and more."[63]

70.    Behavior data is "often collected via a DMP or DSP tag, which is served by publishers or advertisers using tag manager solutions."[64]

71.    "A tag management solution or system (TMS) is a platform that allows you to deploy all the tags on your website via a single container tag."[65]  And "[a] tag is a short snippet of code, usually from a third-party vendor, that companies implement on their site to collect data for analytics and digital marketing tools."

72.    Tag manager solutions include but are not limited to Google Tag Manager.[66]

---

[60] https://www.ghostery.com/whotracksme/trackers/openx (last visited May 12, 2025).

[61] GOOGLE CLOUD, *OpenX: Powering the future of advertising with Google Cloud*, https://cloud.google.com/customers/openx.

[62] *OpenX: Powering the future of advertising with Google Cloud*, GOOGLE CLOUD, https://cloud.google.com/customers/openx (emphasis added).

[63] Dmitri Kazanski, *How to Leverage Data for Programmatic Direct: Types of Targeting Data*, THEXCHANGE BY OPENX (Jun. 6, 2017), https://blog.openx.com/how-to-leverage-data-for-programmatic-direct-types-of-targeting-data/.

[64] *Id.*

[65] https://www.observepoint.com/blog-posts/9-tag-management-solutions/.

[66] *See About Google Tag Manager*, TAG PLATFORM, https://developers.google.com/tag-platform/tag-manager.

73. OpenX also collects behavior data on mobile devices. "[O]n mobile apps, instead of cookies, the [behavior] data is associated with mobile device IDs: AAID for Android and IDFA for iOS."[67]

74. OpenX also collects profile data. Profile data "includes age, gender, ethnicity, family & parenting status, income, net worth, product ownership, political affiliation, and many other characteristics."[68]

75. OpenX collects profile data "online via site or app registration forms, or onboarded by connecting the person's or household offline profiles to cookies and mobile device IDs."[69]

76. OpenX has a symbiotic relationship with publishers and advertisers (its "Advertising Partners") that collect behavior and profile data at the more granular level.

77. OpenX collects and compiles vast amounts of Internet users' activity on a wide variety of websites through its own tracking methods, and also through its Advertising Partners.

78. The Advertising Partners that OpenX contracts with have their own tag and tag manager solutions, which are integrated into the design of websites. To facilitate the identity resolution process, described below, Advertising Partners and their associated tracking solutions send data through OpenX to "map" that information.

79. For example, Adobe Audience Manager is one OpenX Advertising Partner (specifically, a DMP) that OpenX uses to collect this sensitive information.[70]

---

[67] Dmitri Kazanski, *How to Leverage Data for Programmatic Direct: Types of Targeting Data*, THEXCHANGE BY OPENX (Jun. 6, 2017), https://blog.openx.com/how-to-leverage-data-for-programmatic-direct-types-of-targeting-data/.

[68] *Id.*

[69] *Id.*

[70] *See* Romain Vivier, *Are You Curious To Understand How The Programmatic Ad Ecosystem (Dsp, Ssp, Dmp) Works In Detail?*, LINKEDIN (Mar. 23, 2018), https://www.linkedin.com/pulse/you-curious-understand-how-programmatic-ad-ecosystem-dsp-vivier/ (the author's bio says they are a "Sr Manager Solutions Architects at Amazon Web Services").

80. Adobe Audience Manager goes on to explain how one can "[s]et up OpenX as a destination and send Audience Manager segment data to that platform."[71]

81. Adobe Audience Ma.0nager "segment data" is valuable to OpenX as an ad exchange because "[a]udience segmentation is a marketing strategy based on identifying subgroups within the target audience in order to deliver more tailored messaging and build stronger connections."[72]

82. These subgroups can be "based on demographics such as geographic location, gender identity, age, ethnicity, income, or level of formal education."[73]

83. OpenX enhances this data – i.e. "maps" the data – through its own OpenX graph comprised of profile data that it collects.[74]

84. The Advertising Partners that Plaintiffs are currently aware of that engage in this practice include but are not limited to Adobe, LiveIntent, Google Ad Manager, and Permutive.[75] However, there are hundreds if not thousands more Advertising Partners.[76]

85. Once OpenX's Advertising Partners set up OpenX as a destination, OpenX collects information automatically as users access websites and mobile applications. The below excerpt of the traffic from the HuffPost website is illustrative, where Google Ad Manager has, via the

---

[71] OPENX AS AN AUDIENCE MANAGER DESTINATION, ADOBE EXPERIENCE LEAGUE (Apr. 12, 2021), https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/implementation-integration-guides/integrating-third-party/openx-destination.

[72] *Audience Segmentation*, INTUIT | MAILCHIMP, https://mailchimp.com/marketing-glossary/audience-segmentation/.

[73] *Id.*

[74] *See, e.g.*, OPENX AD EXCHANGE PRIVACY POLICY, OPENX, https://www.openx.com/privacy-center/ad-exchange-privacy-policy/ ("[O]ur Ad Exchange can track your online activity to learn about your online browsing behavior and preferences. … Partners we work with can also map their own unique identifiers against our OpenX identifier via a process called 'cookie syncing,' so that they can use data they have collected independently on our Ad Exchange.").

[75] OPENX, *LiveIntent and OpenX Partner to Bring the nonID Addressable Media Solution to Marketers and Publishers*, https://www.openx.com/press-releases/94463/.

[76] *See* OPENX, https://www.openx.com/ (listing "130,000+ Active Puinblisher Domains, Mobile Apps & CTV Apps," and "250+ Data Providers").

"prev_scp" parameter (transmitting custom parameter or targeting criteria),[77] transmitted targeting criteria to OpenX.



86.     Specifically, this transmission shows that OpenX participated in an auction for a particular sized ad banner, placed a bid, returned an ad ID, and responded in mere milliseconds.

87.     This transmission is further accompanied by customer parameters ("cust_params") that provide details, including but not limited to details about the website the user is visiting (here, "huffpost", specifically the "us" edition).  This transmission also includes a "Permutive" audience segment.  Permutive is a DMP[78] that has partnered with OpenX to deliver targeted ads.[79]



---

[77] Aleesha Jacob, Google Ad Manager Advanced Troubleshooting Guide for Display Ads, MONETIZEMORE (last updated Jan. 5, 2025), https://www.monetizemore.com/blog/google-ad-manager-advanced-troubleshooting-guide-for-display-ads/.

[78] https://permutive.com/resource-library/blog/permutive-is-evolving-from-a-dmp-to-an-audience-platform/

[79] https://www.openx.com/press-releases/permutive-first-party-data-media-buying/

88. So, in this example, participating in the OpenX ad exchange, the user profiles of no less than *three* data brokers (Google Ad Manager, Permutive, and OpenX) are being linked and combined together, sent to any number of advertisers for bidding and targeted advertising, and enriching OpenX, the other technology companies involved, and HuffPost alike while trampling consumer privacy in the process. And transmissions similar to this one are happening across all of the websites and apps that participate in the OpenX ad exchange.

89. Specifically, OpenX collects information used to identify individuals across the Internet including, but not limited to, cookies, IP addresses, hashed email addresses, HTTP headers that specify information such as type of browser, device and operating system information, location information, and other unique identifiers associated with web addresses.[80]

90. In addition, OpenX collects information regarding the users' activity on the websites and communications with the websites in the form of full-string URLs and button click events.

91. Finally, OpenX can pair this information to any it has otherwise collected about the user and has compiled into a profile of the user that OpenX maintains, as alleged below.

## C.   Persistent Identifiers

92. All of the above information is used to identify and de-anonymize individuals and track their activity, but persistent identifiers and URL information play particular roles in the OpenX surveillance apparatus.

93. One way OpenX tracks individuals across multiple websites is through the use of persistent identifiers. As the name suggests, persistent identifiers are identifying information that follows an Internet user from one website or app to another. OpenX uses these identifiers to confirm that using a particular website is the same person identified by OpenX on another website.

94. One form of persistent identifier is a browser "cookie." "Cookies are bits of data that are sent to and from your browser to identify you. When you open a website, your browser sends a piece of data to the web server hosting that website."[81]

---

[80] https://www.openx.com/privacy-center/ad-exchange-privacy-policy/ (last visited May 15, 2025).

[81] https://www.microsoft.com/en-us/edge/learning-center/what-are-cookies?form=MA13I2 (last visited Dec. 23, 2024).

95.    OpenX uses several cookies, including but not limited to the 'i' cookie, which is the "user / market cookie."[82]  OpenX says that this cookie "includes a random string created to recognize your device for the purpose of delivering advertisements."[83]  And "[b]y matching this cookie with data collected by Advertising Partners, [OpenX] and [its] Advertising Partners can deliver more relevant ads to you."[84]

96.    Another OpenX cookie is the 'pd' cookie which "stores information about which other third parties the user cookie ('i' cookie) has been synced with."[85]

97.    When a user visits a website participating in the OpenX ad exchange, the Advertising Partner requests that OpenX sets a cookie onto the browser or device of the person visiting the website. OpenX then links these proprietary ID numbers to the cookie and the individual with the cookie:

| Name | Value | Domain |
|------|-------|--------|
| i | ████████████████████████ | .openx... |
| pd | ████████████████████████ | .openx... |
| receive-cookie-deprecation | ███████ | .openx... |
| univ_id | ████████████████████████ | .openx... |

98.    After the cookie is loaded onto a person's browser, each time that person visits a website where OpenX is operating, OpenX uses the cookie to identify the website visitor as the same person who visited previous websites with the same cookie installed on their browser.  As such, OpenX is able to track each individual internet user across multiple sites to create a more detailed profile on that person's beliefs, interests, and habits.

99.    This information is cross-referenced with other information collected by OpenX to specifically identify the individual using the device and to add this web-activity information to a larger profile on the individual to sell their profile for targeted advertising.

---

[82] OPENX, OPENX AD EXCHANGE PRIVACY POLICY, https://www.openx.com/privacy-center/ad-exchange-privacy-policy/ (last updated Feb. 11, 2025).

[83] Id.

[84] Id.

[85] Id.

*1.      IP Addresses*

100.     IP addresses are another common persistent identifier.

101.     An IP address is a unique set of numbers assigned to a device on a network, which is typically expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).   The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses.   Because this proved to be insufficient as the Internet grew, IPv6 was introduced.   IPv6 offers a vastly larger address space with 340 undecillion possible addresses.   While IPv6 adoption has been increasing, many networks still rely on IPv4.[86]

102.     Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.   An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

103.     IP addresses are not freely accessible.   If an individual is not actively sending data packets out, their IP address remains private and is not broadcast to the wider internet.

104.     IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io use databases that map IP addresses to geographic areas— often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.[87]   Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[88]

105.     An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[89] and (ii) "to target specific households, businesses[,] and even

---

[86]  *See, e.g.*, https://www.cloudflare.com/learning/network-layer/internet-protocol/ (last visited Dec. 23, 2024); https://netbeez.net/blog/rfc1918/ (last visited Dec. 23, 2024).

[87] https://iplocation.io/ (last visited Dec. 23, 2024).

[88] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[89] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/ geotargeting-strategies/.

individuals with ads that are relevant to their interests."[90]  Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[91] because "[c]ompanies can use an IP address … to personally identify individuals."[92]

106.    In fact, an IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience.  Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[93]  For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[94]

107.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[95]

108.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[96]

---

[90] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert williams-z7bhf.

[91] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[92] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[93] *See*, *e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[94] *See*, *e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[95] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj 0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV 5-5maUaAgtNEALw_wcB.

[96] *Id*.

109.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms of advertising."[97]  "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[98]

110.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[99]  "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[100]

111.    Putting IP addresses in the hands of a data broker like OpenX is particularly invasive, as the NATO report noted:

> [a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network.  Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behavior across devices and target the user and their devices with ads on different networks.[101]

112.    Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[102]

113.    In other words, not only does the collection of IP addresses by Defendant cause harm in and of itself, the Defendant specifically attaches IP addresses to comprehensive user profiles,

---

[97] Williams, https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] TWETMAN & BERGMANIS-KORATS, *supra* at 11.

[102] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

tracking Plaintiffs and Class Members across the Internet using their IP addresses in conjunction with other data and compiling vast reams of other personal information in the process.

114.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[103]

115.    Likewise, under the California Consumer Privacy Act, IP addresses are considered "personal information" because they are "reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civ. Code § 1798.140(v)(1)(A).[104]

### 2.    Universal Resource Locator

116.    In addition to collecting a myriad of identifiers, OpenX's Advertising Partners' tags and tag manager solutions collect the Universal Resource Locator (URL) of the webpages visited by each individual.

117.    Sometimes known as a "web address," the URL is the name of the webpage as displayed in the address bar of a browser.

118.    Each page on a website has its own individual URL, allowing tags with access to the URL to see which pages of a website a particular internet user visited.

119.    All URLs identify the pages of each page of a website an internet user visited.

120.    For example, when viewing an article on the Bon Appetit website, the full name of the Article is included in the URL:

---

[103] Is an IP Address Personal Data?, Convesio, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; see also What Is Personal Data?, European Commission, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

[104] A "consumer" is defined as "a natural person who is a California resident." Cal. Civ. Code § 1798.140(i).) A "household" is defined as "a group … of consumers who cohabitate with one another at the same residential address and share use of common devices or services." Cal. Civ. Code § 1798.140(1).)

121.    As such, any tag that intercepts the URL on this page also intercepts the titles of the content the users view.  This process works similarly on other websites.

122.    OpenX, through its Advertising Partners' tags and tag manager solutions, collects the URLs and any information that can be gleaned or inferred from those URLs are added to the profiles that OpenX has for that particular user.

   *3. Mobile Advertising Identifiers*

123.    OpenX employs similar methods to track individuals using mobile apps on Android and iOS devices.

---

SECOND AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED   30
CASE NO. 3:25-CV-05588-SI

124.     OpenX owns and operates "software development kits" (SDKs), pieces of code that work independently or with "application programming interfaces" (APIs) and are loaded into mobile apps and can track users' activity on certain apps.[105]

125.     An SDK is a "set of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[106]

126.     An API "acts an intermediary layer that processes data transfer between systems, letting companies open their application data and functionality to external third-party developers [and] business partners."[107]  An API can "work[] as a standalone solution or included within an SDK … [A]n SDK often contains at least one API."[108]  APIs "enable[] companies to open up their applications' [or websites'] data and functionality to external third-party developers, business partners, and internal departments within their companies."[109]

127.     OpenX explains that "[t]he OpenX Mobile SDK enables app publishers to take full control of their programmatic advertising through a direct-integration that delivers improved speed, monetization and premium ad formats."[110]

128.     The OpenX Mobile SDK tracks information including, but not limited to, users': location information, device and advertising identifiers, and usage of the particular app being accessed.[111]

---

[105] https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface) (last visited Dec. 23, 2024).

[106] API VS. SDK: THE DIFFERENCE EXPLAINED (WITH EXAMPLES), https://getstream.io/glossary/api-vs-sdk/.

[107] IBM, *What is an API?*, available https://www.ibm.com/topics/api.

[108] SDK VS. API: WHAT'S THE DIFFERENCE?, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface).

[109] APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

[110] https://www.openx.com/press-releases/openx-delivers-advanced-mobile-sdk-to-market/

[111] *See OpenX Delivers Advanced Mobile SDK to Market*, OPENX, https://www.openx.com/privacy-center/ad-exchange-privacy-policy/ ("[W]e connect companies that offer advertising space

129.    For example, OpenX collects advertising identifiers that are designed to track the app activity of individual users across different apps. Two of the most prominent are AAIDs (for Android devices) and IDFAs (for iOS devices) (collectively, "Mobile Advertising IDs" or "MAIDs").[112]

130.    An AAID is a unique string of numbers which attaches to a device. As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[113] So, for example, if a third party collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both apps.

131.    Although technically resettable, an AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets that identifier. The fact that the use and disclosure of AAIDs is so ubiquitous evinces an understanding on the part of Defendants, Google, and others in the field that they are almost never manually reset by users (or else an AAID would be of no use to advertisers). Byron Tau, MEANS OF CONTROL: HOW THE HIDDEN ALLIANCE OF TECH AND GOVERNMENT IS CREATING A NEW AMERICAN SURVEILLANCE STATE at 175 (2024) ("Like me, most people had no idea about the 'Limit Ad Tracking' menu on their iPhones or the AAID that Google had given even Android devices. Many still don't."); *see also Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) ("While AAID are resettable by users, the plaintiff plausibly alleges that AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID.") (cleaned up).

132.    Using publicly available resources, an AAID can track a user's movements, habits, and activity on mobile applications.[114] Put together, the AAID serves as "the passport for aggregating all of the data about a user in one place."[115]

---

on their … mobile applications … we may collect the following categories of personal data … [including but not limited to] … mobile advertising ID.")

[112] *See id.*

[113] https://support.google.com/googleplay/android-developer/answer/6048248 (last visited Dec. 23, 2024).

[114]https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5 (last visited Dec. 23, 2024).

[115] https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/ (last visited Dec. 23, 2024).

133. Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences. These inferences, combined with publicly available tools, make AAIDs an identifier that sufficiently permits an ordinary person to identify a specific individual.

134. Similarly, an "Identifier for Advertisers, or IDFA for short, is a unique, random identifier (device ID) that Apple assigns to every iOS device. An IDFA would be the equivalent of a web cookie, in the sense that it enables advertisers to monitor users' engagement with their ads, and keep track of their post-install activity."[116]

135. As with the OpenX cookie and AAID, OpenX's collection of IDFAs allows OpenX to track iOS users' activity across the various apps they use. Like the AAID, this data can create inferences about an individual, such as a person's political or religious affiliations, sexuality, or general reading and viewing preferences. These inferences, combined with publicly available tools, sufficiently permits even an ordinary person to identify a specific individual with the IDFA.

136. Regardless of whether these IDs are supposed to be anonymous, MAIDs are often combined with other identifiers to identify users in what is known as ID Bridging. "ID Bridging" is the process of "piecing together different bits of information about" a user "to confidently infer that it is the same individual accessing a publisher's site or sites from various devices or browsers."[117] That is, users can be identified and tracked by "bridging" (or linking) their MAIDs to other sources, such as e-mail addresses, geolocation, or phone numbers.

//

//

//

//

//

//

---

[116] https://www.appsflyer.com/glossary/idfa/ (last visited Dec. 23, 2024).

[117] Kayleigh Barber, *WTF Is The Difference Between Id Bridging And Id Spoofing?*, DIGIDAY (July 8, 2024, https://digiday.com/media/wtf-is-the-difference-between-id-bridging-and-id-spoofing/.

137.    ID Bridging "has long been the foundation of programmatic advertising,"[118] which is the process by which companies "use [] advertising technology to buy and sell digital ads" by "serv[ing] up relevant ad impressions to audiences through automated steps, in less than a second."[119] It entails a "unique identifier[] assigned to individual devices," including "Google's Advertising ID," personal information like geolocation and e-mail address, and "cross-platform linkage."[120]

138.    ID Bridging is a money-making machine for advertisers and app developers.  On the advertiser side, ID Bridging "increase the chances of an ad buying platform finding their inventory to be addressable and, therefore, maximizes their 'ad yields.'"  And on the app developer side, "publishers can boost revenue from direct-sold campaigns by offering advertisers access to more defined and valuable audiences."[121]

---

[118] https://www.adexchanger.com/data-driven-thinking/how-can-id-bridging-the-foundation-of-our-space-suddenly-be-a-bad-thing/.

[119] PROGRAMMATIC ADVERTISING, https://advertising.amazon.com/blog/programmatic-advertising#.

[120] Anete Jodzevica, *ID Bridging: The Privacy-First Future of Audience Targeting*, SETUPAD (Nov. 15, 2024), https://setupad.com/blog/id-bridging/.  Ironically, the example given in this article is a "hashed e-mail," where the e-mail Defendant collected in this example is not hashed.

[121] Bennett Crumbling, *What Is 'ID Bridging' And How Publishers Use It To Grow Direct And Programmatic Revenue?*, OPTABLE (Aug. 22, 2024. https://www.optable.co/blog/what-is-id-bridging.

139. In other words, advertisers will be able to find users that are more directly and likely interested in what is being sold by having access to significantly more information. And app users' information will be more valuable (and therefore, bring in more money to app developers) because it is combined with a plethora of other information from various sources.

140. Many companies (*e.g.*, data brokers, identity graph providers), publicly advertise their ability to conduct such bridging. And OpenX itself has touted the benefits of ID Bridging, noting that it has partnered with LiveIntent, which "deliver[s] its Authenticated Bridge framework and nonID identifier into the OpenX bidstream." This helps OpenX "connect[] Advertiser and Publisher first-party data … The nonID is tied to an active, hashed email in the LiveIntent graph and offers a way to predict the primary email address to be associated with a device or browser, and all insights are tied directly to validated and active emails."[122]

141. Put simply, ID bridging enables the supply-side to extend user identification beyond the scope of one browser or device.[123]

142. Yet, while those within the ID Bridging industry describe it as privacy-protective, it is anything but. As courts have noted, the "ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers" creates "dossiers which can be used to further invade [users] privacy by allowing third parties to learn intimate details of [users'] lives, and target them for advertising, political, and other purposes, ultimately harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them." *Katz-Lacabe v. Oracle Am., Inc.*, 688 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (cleaned up).

143. In February 2019, Oracle published a paper entitled "Google's Shadow Profile: A Dossier of Consumers Online and Real World Life," part of which provides as accurate a description of Google's services (and OpenX's, as Defendant):

---

[122] https://www.openx.com/press-releases/94463/.

[123] *See, e.g.*, Budi Tanzi, *New OpenRTB Specs Ensure Identity Resolution Can Be Done Transparently With Trusted Partners*, EXPERIAN (Dec. 18, 2024), https://www.experian.com/blogs/marketing-forward/new-openrtb-specs-ensure-identity-resolution-can-be-done-transparently-with-trusted-partners/.

> a consumer's "shadow profile" [is a] massive, largely hidden dataset[] of online and offline activities. This information is collected through an extensive web of … services, which is difficult, if not impossible to avoid. It is largely collected invisibly and without consumer consent. Processed by algorithms and artificial intelligence, this data reveals an intimate picture of a specific consumer's movements, socio-economics, demographics, "likes", activities and more. It may or may not be associated with a specific users' name, but the specificity of this information defines the individual in such detail that a name is unnecessary.[124]

144. In other words, ID Bridging is dangerous because of the sheer expanse of information being compiled by companies like Defendant OpenX without the knowledge or consent of users, all of which is being done for pecuniary gain.

### 4. Other Identifiers

145. In addition to the methods described above, which are explicitly designed to track individuals across different devices and apps, OpenX collects other identifying information that allows it to identify the individual using the device and to add this web-activity information to a larger profile on the individual in order to sell their profile for targeted advertising.

146. One method is through collecting hashed e-mail addresses. The logic of this is straightforward. If OpenX collects the same e-mail address from two different site visits, it can determine with almost total accuracy that the sites are both being visited by the same person. The same is true of devices. If the same e-mail address is captured on two different devices, it is very likely those devices are used by the same individual.

147. Although Defendant collects hashed[125] e-mail addresses, the reality is that "the match between your email and its hash is probably already circulating widely and companies are marking money from it."[126] Given the availability online of such "leaked" email/hashed email matches, entities are merely "pretend[ing]to protect your privacy"[127] through SHA-256 and/or other hashing algorithms.

---

[124] GOOGLE'S SHADOW PROFILE: A DOSSIER OF CONSUMERS ONLINE AND REAL WORLD LIFE at 1 (Feb. 2019), https://tinyurl.com/2mtuh7vf.

[125] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash.

[126] PIXEL DE TRACKING, GUERLAIN (LVMH): LUXURY AND SURVEILLANCE, https://www-pixeldetracking-com.translate.goog/fr/votre-email-comme-vecteur-de-surveillance-ultime-illustration-avec-guerlain?_x_tr_sl=fr&_x_tr_tl=en&_x_tr_hl=en&_x_tr_pto=sc.

[127] *Id.*

148. The Federal Trade Commission has warned companies for over a decade—including as recently as July 24, 2024—that hashing is an insufficient method of anonymizing information.[128]

149. This is especially true for OpenX, where "OpenX moved its entire advertising exchange and audience platforms to Google Cloud."[129]

150. Google informs advertisers who wish to "target[ ] Customer Match segments in [] Google Ads campaigns[]" that "Google keeps track of the email addresses and phone numbers for Google accounts and the corresponding hashed strings for those email addresses or phone numbers."130 Accordingly, Google can compare "each hashed string on [a given email] list with the hashed string for email address or phone number of Google accounts[]" to determine "[i]f there's a match[ with a] … corresponding Google account."[131]

151. Thus, even in hashed form, email addresses are traceable to individuals.

152. Location information functions in a similar manner. If multiple websites or apps are visited from the same location, the pool of potential individuals who are accessing the website or app is narrowed considerably immediately and can be narrowed to a pinpoint over time.

153. HTTP requests, when intercepted by OpenX, collect device information that can also identify whether the same user is visiting multiple sites or apps, and can distinguish between the devices being used by a particular person. With every visit, and every subsequent HTTP request, the device information will be identical in each.

---

[128] Ed Felten, *Does Hashing Make Data "Anonymous"?*, Federal Trade Commission (Apr. 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data *is risky at best, and usually wrong.*") (emphasis added); *No, Hashing Still Doesn't Making Your Data Anonymous*, Federal Trade Commission (July 24, 2024) ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized.").

[129] https://cloud.google.com/customers/openx

[130] GOOGLE, ABOUT THE CUSTOMER MATCHING PROCESS, https://support.google.com/google-ads/answer/7474263.

[131] *Id.*

### D.    Identity Resolution

154.    In addition to its own tracking of individuals across the internet, OpenX sells its tracking services to its Advertising Partners through a process known as identity resolution.

155.    Identity resolution is the technology marketing term for the process of data tracking described above. As OpenX describes it:

> [o]ur proprietary identity resolution tool, OpenAudience, uses state-of-the-art data and identity technology to allow marketers to reach their target audiences and segments — connecting you to your desired consumers in more ways than you have ever imagined possible.[132]

156.    In plain language, identity resolution is the culmination of OpenX's and its Advertising Partners' tracking, where OpenX assigns an ID number to an individual so that the individual is attached to a record of their web and app activity for the purpose of targeted advertising.

157.    Once sufficient data has been collected on an individual, OpenX monetizes the individual's data in a number of ways.  One way is to provide individuals' identities and web browsing information to its Advertising Partners to assist with those companies' serving targeted ads to internet users.

158.    When an Advertising Partner interacts with OpenX on a website, OpenX (in addition to the independent tracking described above) interacts with the DSP and DMP and tag manager solutions and allows those DMPs and DSPs to access the information associated with each individual.

159.    In a particular privacy-egregious example of this process from the HuffPost website the Google tag[133] is calling OpenX as a destination,[134] and thereby connecting Google's own

---

[132] https://www.openx.com/buyers/

[133] LOTAME CROWD CONTROL, CONDUIT, https://app.getconduit.app/web/integration/lotame-crowd-control/.

[134] GOOGLE, TAGGING FOR GOOGLE ANALYTICS, https://developers.google.com/analytics/devguides/collection/ga4/tag-options ("The Google tag is a single tag you can add to your website to measure organic and ad performance. You can configure a Google tag for Google Analytics, and send the data from that tag to other products, like Google Ads, by adding destinations to your tag.").

immense repository of user profiles[135] and information with OpenX's.  On top of this, all of this information is *also* then being connected with and provided to Permutive, a Data Management Platform, meaning this transmission is part of the real-time bidding process.[136]

160.    With respect to the delivery of targeted advertisements on websites, OpenX's ID syncing makes the entire real-time-bidding process possible by identifying the individual visiting the site and providing information about their web activity and interests.  This creates the basis for hyper-targeted advertising related to that activity and those interests to be served. This ultimately benefits the website or app operator, as it makes their userbase more valuable because said users have been further identified and linked to other activity via the tags and tag manager solutions.

161.    For these processes to happen, OpenX must necessarily share the information it collects on individual internet users with its partners.

162.    The identity resolution service aids in the wiretapping and surveillance conducted by the Advertising Partners.

**III.    DEFENDANT'S TRACKERS ARE PRESENT ON EACH OF THE SUBJECT WEBSITES AND ACROSS THE INTERNET**

163.    As part of their investigation, Plaintiffs' counsel found and conducted testing on several websites to provide a sample of the widespread tracking and wiretapping of, and targeted advertising to, millions of Americans by OpenX.  For each of the websites tested, there are hundreds or thousands of others where the same or similar information is collected.

164.    Thus, the conduct alleged in this Complaint is *not* limited to the specific websites alleged below.  Indeed, even Plaintiffs themselves visited other websites where Plaintiffs' counsel found OpenX would have tracked them.  Instead, these websites are merely examples of the types of data that OpenX collects, and the ways in which OpenX surveils users across the Internet.

---

[135] GOOGLE, TAGGING FOR GOOGLE ANALYTICS, https://developers.google.com/analytics/devguides/collection/ga4/tag-options.

[136] DATA MANAGEMENT PLATFORM (DMP) VENDORS, CDP, "Permutive's DMP supports both advertisers and publishers. It ingests data from all sources, including first-, second-, and third-party data. The DMP can access audience data on Safari and Firefox, where 3rd party cookies are often blocked. Built on edge processing, Permutive offers real-time segmentation and analysis, including unlimited analysis of historical data and live campaign analysis." https://cdp.com/glossary/data-management-platform-dmp-vendors/.

**A.    Bon Appetit**

165.    Bon Appetit's website is an online food and entertainment magazine that provides, among other things, recipes; articles related to cooking tips and techniques; as well as recommendations and reviews of restaurants and cooking products.

166.    The website also contains ad space where companies, like Defendant, act as an advertising exchange and facilitate the real-time bidding process to hyper-target advertisements to individual website users based on data collected about their browsing activity and other activity.

167.    Unbeknownst to website visitors, the OpenX Tracker is loaded onto each page of the Bon Appetit website.

| :authority: | rtb.openx.net |
| :method: | POST |

168.    Within seconds of the user reaching the Bon Appetit website, the OpenX Tracker takes over 75 actions, including intercepting communications, ID syncing with Partner Trackers, and various other tracking activities.

169.    The OpenX Tracker also immediately loads tracking cookies onto the individual's browser in the manner described herein.

Cookies:
i        988b978f-04e4-4384-ad71-232a8501a50f|1734713545
receive-cookie-deprecation    1
univ_id537072971|b30ee1fd-f2a3-4bcb-a054-62b57d6efa83|1738959395020863
pd      v2|1738959394.11.89.2|iKvMgahEkWgy.mmbwuYg2f8.mKvJwvwIwVeS.nofYvRg6vuwi

170.    The OpenX Tracker also intercepts the detailed, full-string URL from each page of the Bon Appetit website a user visits, as detailed above, thereby intercepting the user's communications with the website regarding which articles they want to view.

```
"publisher": {
        "domain": "bonappetit.com"
},
"page": "https://www.bonappetit.com/gallery/taylor-swift-travis-kelce-pop-tarts",
"ref": "https://www.bonappetit.com/",
"ext": {
        "data": {
                "cnt_tags": ["misc", "cooking"]
```

171.    The OpenX Tracker also collects the user's browser and device information in the manner described above.

```
version : [ 8 ]
}, {
        "brand": "Chromium",
        "version": ["132"]
}, {
        "brand": "Google Chrome",
        "version": ["132"]
}],
"mobile": 0
```

172.    The OpenX Tracker also acts as an SSP on the Bon Appetit website, placing bids to target particular users with advertisements. During Plaintiffs' testing, a bid was placed for a comcast.com ad for $0.89 per thousand impressions ("cpm") in an auction run by the Defendant. When running the auction, Defendant ID synced with several Partner Trackers on the Bon Appetit website to send and obtain information about the individual website user.

```
"id": "57eb2ba3-5b85-4bae-8471-9695afacc05b",
"impid": "116d4a88f1a8634",
"price": 0.899,
"adomain": ["comcast.com"],
"crid": "613272061",
"language": "en",
"w": 970,
"h": 250,
"slotinpod": 0,
"mtype": 1,
"ext": {
  "advid": "1619",
  "dsp_id": "537073246",
  "buyer_id": "1024534"
```

173. Defendant then uses the information it collects to link the user to a de-anonymized profile and adds any new information to that profile. This profile is connected to the ID assigned to the individual and added to Defendant's data products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to these keywords, sentiments, and information viewed—and enriches Bon Appetit—as its users are more valuable now that their information is being connected to Defendant's vast repository of information.

174. In addition, because of the setting of cookies and collecting of the user's device information and IP address, Defendant tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**B.     Covered California**

175. Covered California is a website where Californians can shop for health insurance under the Affordable Care Act. It is part of the state government but runs on its own, with a board chosen by the governor and Legislature.[137]

176. As of March 2025, nearly 2 million people were enrolled in health insurance through the Covered California program –a record high. Approximately one in six Californians have been enrolled through Covered California at some point.[138]

177. On April 28, 2025, The Markup, a nonprofit news organization, published testing of the Covered California website, which found that Covered California had more than 60 other trackers on the site, including the OpenX tracker.[139]

178. The Markup's report, which was backed up by testing data, noted explicitly "Blacklight detected the inspected website sending user data to OpenX, an online advertising exchange … Representatives from OpenX did not respond to multiple requests for comment. The site sent information to the following domain openx.net."

---

[137] https://themarkup.org/pixel-hunt/2025/04/28/how-california-sent-residents-personal-health-data-to-linkedin.

[138] *Id.*

[139] https://github.com/the-markup/investigation-covered-california-linkedin-tracker/blob/main/blacklight-scans/20250224-141900-www.coveredca.com/report.md.

179.    The Markup made the data behind their investigation publicly available.[140]  That data consisted of website traffic recorded by the Markup using its Blacklight tool, and a separate file of cookies set by various trackers.  However, both the web traffic file and the cookie file were related to the same transmission.  Plaintiffs' counsel examined this data collected by The Markup, and the screenshots below are from Plaintiffs' counsel's investigation of that data.

180.    The testing revealed that as soon as a user reaches the Covered California website, the OpenX Tracker loads tracking cookies onto the user's browser in the manner described above.

181.    Confirming that the website traffic above pertains to the Covered California webiste, Covered California also installs first party cookies (which are different from Defendant's tracking cookies) onto the user's browser from the website.  This first-party cookie is set just a few lines down from the OpenX Tracker:

---

[140] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    43
CASE NO. 3:25-CV-05588-SI

182.    The Markup also found the OpenX Tracker collects the users' IP address and device information on the Covered California website (in the red box at the bottom of the screen):



183.    The Markup also found the OpenX Tracker ID syncs with numerous Partner Trackers, giving those entities the information OpenX has collected on the individual website visitor and receiving information collected about that individual by each other entity. For example, the images below show the OpenX tracker syncing and sharing information with the ADNXS Tracker, operated by Microsoft, and the DoubleClick Tracker, operated by Google. Both of these Partner Trackers are involved in the selling of user information to advertisers, which will place higher bids by having OpenX more greatly identify a user:



184.    Defendant then adds the collected information to its profile on the individual. This profile is connected to the ID assigned to the individual and added to Defendant's data products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to these keywords, sentiments, and information viewed—and enriches Bon Appetit—as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

185.    Defendant also, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

IV.    **DEFENDANT'S SERVICES DEANONYMIZE USERS AND ENRICH DEFENDANT AND THE WEBSITE OPERATORS THROUGH REAL-TIME BIDDING AND PROFILING INDIVIDUALS**

A.    **Defendant Combines The Data From The Subject Websites With Other Data To Deanonymize Users**

186.    As a result of OpenX's technology being deployed on thousands or millions of websites, Defendant is collecting various forms of personal information and web activity records of nearly every American and sells that data to target advertising.

187.    The information collected, on its own, is enough to identify the individual internet user.  But this is only the first step in Defendant's practices of dragnet surveillance.

188.    With OpenX's user ID syncing processes, Defendant not only has access to its own information that it tracks from Internet users, but also the information that its partner advertisers

track.[141]   In this way, OpenX amasses and aggregates Internet users' data and sells it back to its partner advertisers.

189.    OpenX has a whole suite of identity products for this purpose.  OpenX also enables companies to target specific people through their product OpenAudience.[142]

**B.    The Partner Trackers Use The Profiles Created By Defendant To Enhance Their Advertising And Analytics Services**

190.    In addition to contributing vast amounts of data to OpenX's data profiles, the data collected by OpenX is utilized by both OpenX and the Partner Trackers to conduct hyper-targeted advertising through the real-time bidding process.

191.    The OpenX identity resolution process is a key part of a complex ecosystem of pixels that deliver detailed user information to advertisers to increase the efficiency of those advertisements.

192.    Further, the delivery of advertisements facilitated by OpenX, involves the sharing of vast amounts of consumer information with Partner Tracker.

193.    When OpenX shares website visitor information with a Partner Tracker, that partner (i) uses the information provided by OpenX to add information to its own data and advertising datasets and (ii) shares the identity information with other advertisers during the real-time bidding delivery of advertisements.

194.    For ads to be delivered as soon as a website user visits a site, multiple technology companies need access to detailed information about the identity and interests of the individual website visitor.

195.    This information is provided by the Partner Trackers, who use Defendant's identity resolution services or advertising services (which they pay for) to create and expand their own datasets, which they in turn disclose to other players in the real-time bidding ecosystem as advertisements are delivered on websites.

196.    Each time a user is selected by this network of advertisers to receive an ad, the advertisers "bid" on the user—meaning Defendant or the Partner Trackers are paid for the

---

[141] *Id.*

[142] *Buyers*, https://www.openx.com/buyers/

information they have stored about that user.  Millions of these bids are made per day across the Internet, demonstrating the immense value of the data Defendant improperly collects on Plaintiffs and Class Members.

197.    As such, the improper collection of vast amounts of data on Plaintiffs and Class Members is done both for Defendant's profit and for the profit of the Partner Trackers.

198.    OpenX's business model has nothing to do with maintaining any of its customers' websites.  OpenX's technology is used for the sole purpose of collecting data and selling that data to target advertising. As described above, the data collected about an individual from a website is not only used by the operator of the website, but is used by OpenX across the internet and is sold to numerous data brokers and online advertisers who have no connection whatsoever to the original website.

V.    PLAINTIFFS' EXPERIENCES

    A.    Plaintiff Kristin Cobbs

199.    Plaintiff Cobbs visited the Covered CA website while in California in or about 2024 to apply for health insurance.

200.    Unbeknownst to Plaintiff Cobbs, the OpenX Tracker was loaded onto each page of the website.

201.    The OpenX Tracker installed multiple tracking cookies onto Plaintiff Cobbs's browser.

202.    When Plaintiff Cobbs visited the Covered CA website, OpenX exchanged information about Plaintiff Cobbs on the Covered California website through ID syncing and cookie syncing.

203.    OpenX also collected information about Plaintiff Cobbs's device, browser, and tracked her as she navigated through the website.

204.    Defendant provided Partner Trackers with identity resolution services so that those entities could deanonymize the data it collected on Plaintiff Cobbs, bolster their own data profiles, and sell her information during the real-time-bidding process.

205.    Defendant used the information collected by the OpenX Tracker to:

(a)    identity Plaintiff Cobbs and either create a new profile of her or match her to a pre-existing profile (either in the Defendant's own databases or with another entity's profile);

(b)    enable the Covered CA website and Partner Trackers to sell Plaintiff Cobbs's information to advertisers for hyper-targeted advertising based on the information collected by the OpenX Tracker on the Covered California website and the information contained on any profiles of Plaintiff (which are linked to Plaintiff Cobbs via the information collected by Defendant on the Covered CA website);

(c)    enable the Covered CA website and Partner Trackers to target Plaintiff Cobbs with advertisements and serve advertisements on Plaintiff Cobbs based on the information collected and the information contained on any profiles of Plaintiff Cobbs (which are linked to Plaintiff via the information collected by Defendant on the Covered CA website); and

(d)    de-anonymize Plaintiff Cobbs and generate revenue from the sale of Plaintiff Cobbs's information—both what is collected on the Covered CA website and the profiles this information is linked to—to advertisers, thus boosting the Covered CA website's revenue and the value of Defendant's services.

206.    By using the cookies loaded onto Plaintiff Cobbs's browser, Defendant also tracked her future web browsing activity across the internet and assisted other Partner Trackers in tracking her and wiretapping her communications with websites.

207.    Plaintiff Cobbs was unaware that Defendant was installing trackers on her browser, aiding in the wiretapping of her communications, deanonymizing her personal data, or collecting, selling, and disclosing her personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor could Plaintiff Cobbs have discovered these facts.

208.    Plaintiff Cobbs did not provide her prior consent to Defendant to install trackers on her browser, aid in the wiretapping of her communications, deanonymize her personal data, or collect, sell, and disclose her personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor did Defendant obtain a court order to do the same.

209. Plaintiff Cobbs has, therefore, had her privacy invaded by Defendant's violations of the CIPA and ECPA, and Defendant has been unjustly enriched by enabling the disclosure and sale of the improperly collected data concerning Plaintiff Cobbs.

**B.     Plaintiff Dilara Uskup**

210. Plaintiff Dilara Uskup visited numerous websites where Plaintiffs' counsel identified the presence of the OpenX Tracker.

211. Data from Plaintiff Uskup's browser confirmed that Defendant was tracking her and loaded multiple tracking cookies on her browser.

212. When Plaintiff Uskup visited the websites, OpenX exchanged information about Plaintiff Uskup through ID syncing and cookie syncing.

213. OpenX also collected information about Plaintiff Uskup's device, browser, and tracked her as she navigated through the websites.

214. Defendant provided Partner Trackers with identity resolution services so that those entities could deanonymize the data it collected on Plaintiff Uskup, bolster their own data profiles, and sell her information during the real-time-bidding process.

215. Defendant used the information collected by the OpenX Tracker to:

(e)     identity Plaintiff Uskup and either create a new profile of her or match her to a pre-existing profile (either in the Defendant's own databases or with another entity's profile);

(f)     enable the websites and Partner Trackers to sell Plaintiff Uskup's information to advertisers for hyper-targeted advertising based on the information collected by the OpenX Tracker on the websites and the information contained on any profiles of Plaintiff (which are linked to Plaintiff Uskup via the information collected by Defendant on the websites);

(g)     enable the Covered CA website and Partner Trackers to target Plaintiff Uskup with advertisements and serve advertisements on Plaintiff Uskup based on the information collected and the information contained on any profiles of Plaintiff Uskup (which are linked to Plaintiff via the information collected by Defendant on the websites); and

(h)     de-anonymize Plaintiff Uskup and generate revenue from the sale of Plaintiff Uskups's information—both what is collected

on the websites and the profiles this information is linked to—
to advertisers, thus boosting the websites' revenue and the value
of Defendant's services.

216. By using the cookies loaded onto Plaintiff Uskup's browser, Defendant also tracked her future web browsing activity across the internet and assisted other Partner Trackers in tracking her and wiretapping her communications with websites.

217. Plaintiff Uskup was unaware that Defendant was installing trackers on her browser, aiding in the wiretapping of her communications, deanonymizing her personal data, or collecting, selling, and disclosing her personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor could Plaintiff Uskup have discovered these facts.

218. Plaintiff Uskup did not provide her prior consent to Defendant to install trackers on her browser, aid in the wiretapping of her communications, deanonymize her personal data, or collect, sell, and disclose her personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor did Defendant obtain a court order to do the same.

219. Plaintiff Uskup has, therefore, had her privacy invaded by Defendant's violations of the CIPA and ECPA, and Defendant has been unjustly enriched by enabling the disclosure and sale of the improperly collected data concerning Plaintiff Uskup.

**C.    Plaintiff Christian Calcines**

220. In or about April 2025, Plaintiff Christian Calcines visited the Bon Appetit website while in California and selected various articles.

221. Unbeknownst to Plaintiff Calcines, the OpenX Tracker was loaded onto each page of the website.

222. Testing from Plaintiff's own browser shows that as soon as he reached the Bon Appetit website, the Open X Tracker collected his IP address and information about his device and browser.[143]

223. The OpenX Tracker also installed multiple tracking cookies onto Plaintiff Calcines's browser.

224. When Plaintiff Calcines visited the Bon Appetit website, OpenX called the Partner Trackers on the website.

225. OpenX and its Partner Trackers all collected information about Plaintiff Calcines's device, browser, and tracked him as he navigated through the website.

226. Defendant provided Partner Trackers with identity resolution services so that those entities could deanonymize the data it collected on Plaintiff Calcines, bolster their own data profiles, and sell his information during the real-time-bidding process.

227. Defendant also intercepted Plaintiff Calcines's article selections (his communications with the Bon Appetit website) and audience information related to those selections.

228. These interceptions happened in real time as Plaintiff Calcines navigated through the website.

229. Defendant used the OpenX Tracker to:

    (a)    identity Plaintiff Calcines and either create a new profile of him or match him to a pre-existing profile (either in the Defendant's own databases or with another entity's profile);

---

[143] The string of numbers after the "x-forwarded-for" label is Plaintiff Calcines's IP address. All but the first five digits of Plaintiff Calcines's IP address were redacted to protect his privacy.

(b) enable the Bon Appetit website and Partner Trackers to sell Plaintiff Calcines's information to advertisers for hyper-targeted advertising based on the information collected by the OpenX Tracker on the Bon Appetit website and the information contained on any profiles of Plaintiff Calcines (which are linked to Plaintiff Calcines via the information collected by Defendant on the Bon Appetit website);

(c) enable the Bon Appetit website and Partner Trackers to target Plaintiff Calcines with advertisements and serve advertisements on Plaintiff Calcines based on the information collected and the information contained on any profiles of Plaintiff Calcines (which are linked to Plaintiff Calcines via the information collected by Defendant on the Bon Appetit website); and

(d) de-anonymize Plaintiff Calcines and generate revenue from the sale of Plaintiff Calcines's information—both what is collected on the Bon Appetit website and the profiles this information is linked to—to advertisers, thus boosting the Bon Appetit website's revenue and the value of Defendant's services.

230. Defendant also, by using the cookies loaded onto Plaintiff Calcines's browser, tracked his future web browsing activity across the internet and assisted other Partner Trackers in tracking him and wiretapping his communications with websites.

231. Plaintiff Calcines also visited other websites where Plaintiffs' counsel's testing identified the presence of the OpenX Tracker, including, but not limited to:

(a) Apartmenttherapy.com;

(b) Foxnews.com; and

(c) BusinessInsider.com

232. Plaintiff Calcines was unaware that Defendant was installing trackers on his browser, aiding in the wiretapping of his communications, deanonymizing his personal data, or collecting, selling, and disclosing his personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor could Plaintiff Calcines have discovered these facts.

233. Plaintiff Calcines did not provide his prior consent to Defendant to install trackers on his browser, aid in the wiretapping of his communications, deanonymize his personal data, or collect,

sell, and disclose his personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor did Defendant obtain a court order to do the same.

234.    Plaintiff Calcines has, therefore, had her privacy invaded by Defendant's violations of the CIPA and ECPA, and Defendant has been unjustly enriched by enabling the disclosure and sale of the improperly collected data concerning Plaintiff Calcines.

## CLASS ALLEGATIONS

235.    **Class Definition:** Plaintiffs seek to represent a class of similarly situated individuals defined as follows:

> All persons in the United States whose personal information, communications, or private information, or data derived from their personal information, communications, or private information, was used to create a profile and/or  made available for sale or use through Defendant's platform, distributed or sold in the process of delivering advertising on websites, mobile applications, or other digital media, or otherwise.

236.    **California Subclass**: Plaintiffs also seek to represent a subclass of similarly situated individuals defined as follows:

> All  California  residents  whose  personal  information, communications, or private information, or data derived from their personal information, communications, or private information, was used to create a profile and/or  made available for sale or use through Defendant's platform, distributed or sold in the process of delivering advertising on websites, mobile applications, or other digital media, or otherwise.

237.    The Class and California Subclass shall be collectively referred to as the "Classes," and Members of the Class and Subclass will collectively be referred to as "Class Members," unless it is necessary to differentiate them.

238.    Excluded from the Classes are Defendant, any affiliate, parent, or subsidiary of any Defendant; any entity in which any Defendant has a controlling interest; any officer director, or employee of any Defendant; any successor or assign of any Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

239. **Numerosity**. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiffs currently; however, it is estimated that there are tens or hundreds of millions of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Defendant's customers and advertising partners.

240. **Typicality**. Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs, like all Class Members, had their information collected and made available for sale by Defendant using comprehensive user profiles compiled about Plaintiffs.

241. **Adequacy**. Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

242. **Commonality/Predominance**. Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members because Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

    (a)    Whether Defendant's acts and practices alleged herein constitute egregious breaches of social norms;

    (b)    Whether Defendant acted intentionally in violating Plaintiffs' and Class Members' privacy rights under the California Constitution or common law;

    (c)    Whether Plaintiffs and Class Members are entitled to damages under CIPA or any other relevant statute;

243. **Superiority**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would

engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs know of no special difficulty to that would be encountered by litigating this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT I
### Intrusion Upon Seclusion

244. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

245. Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

246. Plaintiffs bring this claim pursuant to California law.

247. To state a claim for intrusion upon seclusion "[Plaintiffs] must possess a legally protected privacy interest … [Plaintiffs'] expectations of privacy must be reasonable … [and Plaintiffs] must show that the intrusion is so serious in 'nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms." *Hernandez v. Hillsides, Inc*. 47 Cal. 4th 272, 286-87 (2009).

248. Plaintiffs and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive, confidential communications and information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to highly intrusive surveillance at every turn.

249. By conducting such widespread surveillance, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

250. Plaintiffs and Class Members had a reasonable expectation that their communications, identities, personal activities, and other data would remain confidential.

251. Plaintiffs and Class Members did not and could not authorize Defendant to intercept data on every aspect of their lives and activities.

252. The conduct described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

(a) Defendant engages in widespread data collection and interception of Plaintiffs' and Class Members' internet and app activity, including their communications with websites and apps, thereby learning intimate details of their daily lives based on the massive amount of information collected about them.

(b) Defendant combines the information collected on websites and apps with offline information also gathered on individuals to create the profiles used in the OpenX products described herein.

(c) Defendant creates comprehensive profiles based on this online and offline data, which violates Plaintiffs' Class Members' common law right to privacy and the control of their personal information.

(d) Defendant sells or discloses these profiles, which contain the improperly collected data about Plaintiffs and Class Members, to an unknown number of advertisers for use in the real-time-bidding process, which likewise violates Plaintiffs' and Class Members' common law right to privacy and the control of their personal information.

253. Defendant's amassment of electronic information reflecting all aspects of Plaintiffs' and Class Members' lives into profiles for future or present use is in and of itself a violation of their right to privacy considering the serious risk these profiles pose to their autonomy.

254. In addition, those profiles are and can be used to further invade Plaintiffs' and Class Members' privacy by, for example, allowing third parties to learn intimate details of their lives and target them for advertising, political, and other purposes, as described herein, thereby harming them by selling this data to advertisers and other data brokers without their consent.

255. Accordingly, Plaintiffs and Class and California Subclass Members seek all relief available for invasion of privacy claims under common law.

**COUNT II**
**Violation Of The California Invasion of Privacy Act**
**Cal. Penal Code § 631(a)**

256.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

257.    Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

258.    The California Legislature enacted the CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

259.    The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*."  *Ribas*, 38 Cal. 3d at 363 (emphasis added, internal quotations omitted).  This restriction is based on the "substantial distinction … between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor*, whether that auditor be a person or mechanical device."  *Id*. at 361 (emphasis added).  Such "simultaneous dissemination" "denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements."  *Id*.; *see also Reporters Committee for Freedom of Press*, 489 U.S. at 763 ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

260.    Further, "[t]hough written in terms of wiretapping, Section 631(a) applies to Internet communications."  *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022).  Indeed, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme."  *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013).  This accords with the fact that "the California Supreme Court has [] emphasized that all CIPA provisions are to be interpreted in light of the broad privacy-protecting

statutory purposes of CIPA." *Javier*, 2022 WL 1744107, at *2. "Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

261. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

262. To avoid liability under CIPA § 631(a), a defendant must show it had the consent of *all* parties to a communication, and that such consent was procured *prior to* the interception occurring. *See Javier*, 2022 WL 1744107, at *2.

263. Defendant's Tracker, various pixels and SDKs are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

264.    Defendant is a "separate legal entity that offers [a] 'software-as-a-service' and not merely [] passive device[s]." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Defendant has the capability to use the wiretapped information for a purpose other than simply recording the communications and providing the communications to website operators. Accordingly, Defendant was a third party to any communication between Plaintiffs and California Subclass Members, on the one hand, and any of the websites at issue, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

265.    At all relevant times, Defendant and the Partner Trackers willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents of the electronic communications of Plaintiffs and California Subclass Members, on the one hand, and the websites at issue, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

266.    At all relevant times, Defendant uses those intercepted communications, including but not limited to building comprehensive user profiles that are offered for disclosure or sale in real-time bidding to prospective advertisers.

267.    Further, Defendant "[a]ids, agrees with, employs, or conspires with" each Partner Tracker that it provides identity resolution to and who intercepts Plaintiffs' and California Subclass Members' confidential communications, in that Defendant enables these Partner Trackers to identify the user behind any specific communication.

268.    Plaintiffs and California Subclass Members did not provide their prior consent to Defendant's intentional interception, reading, learning, recording, collection, and usage of Plaintiffs' and California Subclass Members' electronic communications.

269.    The wiretapping of Plaintiffs and California Subclass Members occurred in California, where Plaintiffs and California Subclass Members accessed the websites, where Defendant's Tracker was loaded on Plaintiffs' and California Subclass Members' browsers, and where Defendant routed Plaintiffs' and California Subclass Members' electronic communications to Defendant's servers.

270. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and California Subclass Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT III
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 638.51(a)

271. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

272. Plaintiffs bring this claim individually and on behalf of the proposed California Subclass against Defendant.

273. CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

274. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

275. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

276. In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

277. For example, if a user sends an email, a "pen register" might record the email address it was sent from, because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, because this is *incoming* information that is being sent to that same user.

278. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record

the numbers of incoming calls to that particular telephone line. As technology has advanced, however, courts have expanded the application of these surveillance devices. Indeed, Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013).

279. Accordingly, courts have applied the CIPA to internet tracking technologies, including CIPA § 638.50, to trackers similar to OpenX's here. *See*, *e.g.*, *Deivaprakash v. Condé Nast Digital*, --- F. Supp. 3d ---, 2025 WL 2541952, at *2-3 (N.D. Cal. Sept. 4, 2025) (finding tracker that collected IP address and device information was a "pen register" within the meaning of CIPA); *Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *1, *5-6 (N.D. Cal. Oct. 9, 2025) (same); *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (same); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Riganian v. LiveRamp Holdings, Inc.*, 2025 WL 2021802, at *11-12 (N.D. Cal. July 18, 2025) (same); *Scarlett v. Future US, LLC*, 2025 WL 2614587, *4-5 (San Francisco Cnty. Super. Ct. Sept. 5, 2025) (same); *Rose v. Variety Media, LLC*, 2025 WL 2794920, at *2-3 (Los Anges Cnty. Super. Ct. Sept. 24, 2025) (same); *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 40-42 (S.D.N.Y. 2025) (Marrero, J.) (finding trackers similar to those here are "pen registers" under the CIPA); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register");

280. The OpenX Trackers installed on Plaintiffs' and California Subclass Members' browsers are "pen registers" because they are "device[s] or process[es]" that "capture" the "routing, addressing, or signaling information"—the IP address, geolocation, device information, and other persistent identifiers—from the electronic communications transmitted by Plaintiffs' and California Subclass Members' computers or smartphones. Cal. Penal Code § 638.50(b).

281. At all relevant times, Defendant used the OpenX Trackers—which are pen registers—installed on Plaintiffs' and California Subclass Members' browsers, which enabled Defendant to

collect Plaintiffs' and California Subclass Members' IP addresses, geolocation, device information, and other persistent identifiers from the websites they visited.  Defendant used the Trackers to build comprehensive user profiles, which were used to unjustly enrich Defendant and its clients by linking and enhancing Plaintiffs' and California Subclass Members' data when it is provided to advertisers through the real-time bidding process.

282.    Plaintiffs and California Subclass Members did not provide their prior consent to Defendant's installation or use of the OpenX Tracker or any other tracking technology at issue.

283.    Defendant did not obtain a court order to install or use the OpenX Tracker, pixels or other tracking technology at issue.

284.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and California Subclass Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

### COUNT IV
**Violation of the Electronic Communications Privacy Act
18 U.S.C. §§ 2511(1), *et seq.***

285.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

286.    Plaintiffs bring this claim individually and on behalf of the Class against Defendant and on behalf of the Class against Defendant.

287.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

288.    The ECPA protects both the sending and the receipt of communications.

289.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

290.    The transmission of Plaintiffs' website page visits, selections, purchases and persistent identifiers to each website each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

291.    The transmission of this information between Plaintiffs and Class members and each website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

292.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

293.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

294.    The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication."  18 U.S.C. § 2510(5).

295.    The following instruments constitute "devices" within the meaning of the ECPA:

- The OpenX Tracker;

- Any other tracking code or SDK used by Defendant;

- Each Partner Tracker;

- The plan Defendant carried out to effectuate the tracking and interception of Plaintiffs' and Class Members' communications while they were using a web browser to navigate the Website.

296.    Plaintiffs and Class Members' interactions with each website are electronic communications under the ECPA.

297.    By utilizing the OpenX Tracker, as described herein, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiffs and Class members in violation of 18 U.S.C. § 2511(1)(a).

298.    Defendant intercepted communications that include, but are not limited to, communications to/from Plaintiffs and Class members regarding their food and restaurant preferences, cookware shopping habits, consumption of media, geolocation, and many more.  This

confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

299.    By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

300.    Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, and other state wiretapping and data privacy laws, among others.

301.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, "[t]he association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Marden v. LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

302.    Defendant was not acting under the color of law to intercept Plaintiffs' and Class members' wire or electronic communications.

303.    Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy.  Plaintiffs and Class members had a reasonable expectation that Defendant would not intercept their communications and sell their data to dozens of parties without their knowledge or consent.

304.    The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. §§ 2511(1), *et seq*.

305.    As a result of each and every violation thereof, on behalf of themselves and the Class, Plaintiffs seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. §§ 2510, *et seq*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all Class Members, seek judgment against Defendant, as follows:

(a)    For an order certifying the Classes pursuant to Fed. R. Civ. P. 23, naming Plaintiffs as the representative of the Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes.

(b)    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(c)    For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(d)    For pre- and post-judgment interest on all amounts awarded; and

(e)    For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  March 31, 2026                    Respectfully submitted,

**BURSOR & FISHER, P.A**.

By: */s/ Philip L. Fraietta*
        Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor

Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
           jwilner@bursor.com

**BURSOR & FISHER, P.A**.
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiffs*